Michael B. TIKKANEN, and all others similarly situated, Barry Rosenberg, and all others similarly situated, Plaintiffs.

v.

CITIBANK (SOUTH DAKOTA) N.A., MBNA American Bank, N.A., f/k/a MBNA America, N.A., Defendants.

Michelle NELSON, and all others similarly situated, Janis Ideson, and all others similarly situated, Donald Lauer, and all others similarly situated, Plaintiffs,

v.

CITIBANK (SOUTH DAKOTA) N.A., First National Bank of Omaha, Bank One, Columbus, N.A., MBNA American Bank, N.A. f/k/a MBNA America, N.A., Defendants.

Civ. Nos. 4–92–286, 4–92–287.

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 10, 1992.

As Modified Oct. 29, 1992.

Charles H. Johnson, Johnson Law Office, John G. Gisselquist, Gisselquist Law Office, St. Paul, Minn., for plaintiffs Michael B. Tikkanen and Barry Rosenberg.

William H. Crowder, Mark Reinhardt, Reinhardt & Anderson, St. Paul, Minn., for plaintiffs Michelle Nelson, Janis Ideson, and Donald Lauer.

Lawrence C. Brown, James L. Volling, Faegre & Benson, Minneapolis, Minn., for defendants.

Arnold M. Lerman, Christopher R. Lipsett, John B. Bellinger, Wilmer, Cutler & Pickering, Washington, D.C., for defendant Citibank (South Dakota) N.A.

John L. Warden, Richard J. Urowsky, Lori S. Sherman, Sullivan & Cromwell, New York City, for defendant MBNA America Bank, N.A.

## MEMORANDUM AND ORDER

MacLAUGHLIN, Chief Judge.

These related matters are before the Court on plaintiffs' motions to dismiss without prejudice and on defendants' motions for summary judgment. Plaintiffs' motions will be denied and defendants' motions will be granted.

FACTS

Plaintiffs in these two related actions are credit card customers of the defendant banks. Defendants are national banks located in states other than Minnesota. Plaintiffs, all residents of Minnesota, brought suit in state court, challenging defendants' practices of charging late fees and overlimit fees in addition to periodic interest. Plaintiffs apparently concede that the fees assessed by the defendant banks are permitted by the laws of the states in which the defendants are located. However, plaintiffs allege that the late and

overlimit fees violate Minn.Stat. § 48.-185(4), and claim that by charging the fees, defendants have engaged in unfair and deceptive practices under Minnesota law. They ask the Court to award them the illegal fees charged or collected by defendants, as well as all interest charged on such fees.

As noted above, these actions began in state court. Defendants removed the actions to federal court on the ground that the complaints asserted claims that were so completely preempted by federal law that they were necessarily federal in nature. By order dated May, 28, 1992, this Court held that plaintiffs' claims were federal in nature and that the actions were therefore properly removed. Defendants in both actions now move for summary judgment; plaintiffs oppose the motions for summary judgment, and move to dismiss their claims without prejudice.

DISCUSSION

I. *The Motions to Dismiss*

 Under Federal Rule of Civil Procedure 41(a), a plaintiff may dismiss an action after a summary judgment motion has been filed only upon order of the court. The purpose of this rule is to prevent voluntary dismissals that unfairly affect the defendant. *Paulucci v. City of Duluth*, 826 F.2d 780, 782 (8th Cir.1987). In determining whether to grant a plaintiff's motion for voluntary dismissal, a court may consider numerous factors, including the effort and expense expended by the defendant, the plaintiff's justification for dismissal, the fact that a motion for summary judgment has been filed, and whether dismissal would prejudice the defendant. *Id.* at 782–83.

 Plaintiffs argue that voluntary dismissal is warranted, because the law regarding the extent to which state consumer protection laws are enforceable against national banks is unsettled. Actions raising the issue have been filed throughout the country, and the United States Court of Appeals for the First Circuit recently held that state laws regarding late and overlimit fees were preempted by federal statutes governing the interest rates charged by federally insured state-chartered banks. *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir.1992). Plaintiffs state that the First Circuit decision, together with this Court's order denying their motions to remand, has convinced them that these actions should not proceed until the applicable law becomes better defined. They argue that it is apparent that the United States Supreme Court will ultimately have to consider the issue; therefore, they continue, it would be a misuse of judicial resources and the time and energy of the parties to proceed with these actions before the Supreme Court resolves the issue. In addition, plaintiffs argue that because discovery has barely begun, defendants would not be prejudiced by dismissal. The most expeditious course of action, in plaintiffs' view, would be to dismiss the actions or stay them pending a Supreme Court decision.

Defendants argue that dismissal is unwarranted. They assert that they have expended substantial effort and expense to defend these actions. In addition, they maintain that as a business matter, they have a vital interest in the prompt resolution of plaintiffs' claims. Finally, they point out that the summary judgment motions have been fully briefed and are dispositive of the actions; thus, a decision on the summary judgment motions is an efficient way to bring this litigation to a close. Defendants see no reason why these actions should stop merely because other actions raising similar issues are pending in other courts.

The Court concludes that dismissal of the actions is unwarranted under *Paulucci*. The fact that the law is unsettled is not sufficient reason to dismiss an action. Moreover, it appears that because of the First Circuit decision and this Court's May 28, 1992 order, the law is actually more settled than it was before plaintiffs brought suit. Plaintiffs may not dismiss their actions without prejudice merely because the law has become settled in a way that they do not like. This is especially true where dismissal would prejudice the defendants. Substantial resources have

been committed to arguing the motions for remand and the motions for summary judgment. Ruling on the summary judgment motions, which have been fully briefed by both sides, is the most efficient way to resolve these actions.

■ Nor does the Court believe that a stay of these actions is appropriate. There is no case pending before the Supreme Court that would resolve the issues presented here. Indeed, the First Circuit appears to be the only appellate court to have addressed the issue. It could be years before the issue reaches the Supreme Court, and there is no reason to hold these actions in abeyance until the Supreme Court considers the question. Therefore, the Court will deny plaintiffs' motions to dismiss or stay the actions.

II. *The Summary Judgment Motions*

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Whole-*

*sale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir. 1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### A. The Law Governing Interest Charged by National Banks

The National Bank Act allows national banks such as defendants to charge their credit card customers "interest at the rate allowed by the laws of the State ... where the bank is located." 12 U.S.C. § 85. The issues in the instant action arise out of two lines of cases interpreting section 85. The first line of cases affects the definition of interest under the statute. Courts applying section 85 have treated a wide variety of charges as interest within the meaning of the statute. *See, e.g., Fisher v. First National Bank,* 548 F.2d 255 (8th Cir.1977) (cash advance fee); *McAdoo v. Union Nat'l Bank,* 535 F.2d 1050, 1056 (8th Cir. 1976) (compensating balance requirements); *Cronkleton v. Hall,* 66 F.2d 384, 387 (8th Cir.), *cert. denied,* 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590 (1933) (bonus or commission paid to lender); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 F.2d 855, 863 (6th Cir.1972) (closing costs); *Schumacher v. Lawrence,* 108 F.2d 576, 577 (6th Cir.1940) (taxes and recording fees); *Panos v. Smith,* 116 F.2d 445 (6th Cir.1940) (same); *American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781 (9th Cir.1982) (compensating balance requirements); *Kenty v. Bank One, Columbus, N.A.,* 1992 WL 170605 (S.D.Ohio Apr. 23, 1992) (excessive and unauthorized insurance premiums).

As the Court noted in its May 28, 1992 order, 794 F.Supp. 312, the most important of these cases for purposes of the instant actions is *Fisher,* in which the United States Court of Appeals for the Eighth

Circuit held that section 85 allowed a national bank located in Nebraska to impose on its Iowa credit card customers both the method of computing interest and the flat fee for credit card advances that Nebraska law allowed. The Eighth Circuit based its holding on the "most favored lender doctrine," which the court explained follows:

12 U.S.C. § 85 was designed by Congress to place national banks on a plane of at least competitive equality with other lenders in the respective states, and, indeed, to give to national banks a possible advantage over state banks in the field of interest rates. Thus, a national bank is not limited to the interest rate that a state bank may charge with respect to a particular type of loan if another lender in the state is permitted to charge a higher rate of interest on the same type of loan. In that situation the national bank may charge the higher rate.

*Fisher*, 548 F.2d at 259. The *Fisher* court concluded that because section 85 allowed national banks located in Nebraska to charge interest at the rate allowed by state law, and because Nebraska law allowed some classes of state lenders to charge flat fees for loans, national banks located in Nebraska could also charge flat fees for loans. In its May 28, 1992 order, this Court held that under *Fisher*, interest under section 85 could not be defined narrowly to include only periodic interest charges, but included flat fees as well.

The other line of cases affecting these actions deal with the "exportation principle" of section 85. The *Fisher* holding demonstrates this principle, because the *Fisher* court held not only that the national bank could borrow the flat fee charged by other lenders in Nebraska, but that it could "export" that fee and impose it on its Iowa customers as well. The United States Supreme Court validated the *Fisher* court's holding in *Marquette National Bank of Minneapolis v. First Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). The issue in *Marquette* was whether a national bank chartered in Nebraska could charge its Minnesota credit card customers an interest rate that was allowed under Nebraska law, but was higher than the rate allowed by Minnesota's usury law. The Court held that under the plain language of section 85, a national bank could charge the rate of interest allowed by the state in which it was located—that is, the state named in its organization certificate. The fact that the bank extended credit to residents of another state, the Court reasoned, did not alter the bank's location. *Marquette*, 439 U.S. at 310, 99 S.Ct. at 546. Because section 85 allowed the bank to charge the interest allowed by Nebraska law, it overrode Minnesota's interest rate ceilings.

In reaching this result, the Court rejected the argument that allowing national banks to export the interest rates of their home states violated the basic legislative intent of the National Bank Act. The *Marquette* petitioners argued that the purpose of the National Bank Act was to insure competitive equality between state and national banks. In the petitioners' view, that purpose could be met by applying section 85 to intrastate loans only; to apply section 85 to interstate loans as well would enlarge the original intent of Congress and undercut the basic policy of the statute by upsetting the competitive equality of state and national banks. The Court found, however, that section 85 was intended not merely to place state and national banks on an equal footing, but to give advantages to national banks over their state competitors. *Marquette*, 439 U.S. at 314, 99 S.Ct. at 548.

In addition, the Court noted that the issue in *Marquette* was not the competitive equality of state and national banks located within the same state, but the inequalities occurring when a national bank applies the interest rates of its home state in a foreign state; that inequality affected both the state and the national banks in the foreign state. Thus, the Court reasoned that whether the exportation of interest rates violated the congressional intent behind section 85 depended upon whether Congress, in enacting the section, was aware that a system of interstate banking existed in which such inequalities would occur. The Court concluded that in enacting the

National Bank Act, Congress was not only aware of the interstate nature of banking—including interstate loans—but intended to facilitate it. *Id.* at 314–15, 317–18, 99 S.Ct. at 548–49, 549–50. Thus, interpreting section 85 to allow the exportation of interest rates did not violate congressional intent or the policies behind the National Bank Act.

Significantly, the Court acknowledged that the exportation of interest rates could impair the ability of states to enact effective usury laws. The Court reasoned, however, that

> [t]his impairment ... has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates.... This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.

*Id.* at 318–19, 99 S.Ct. at 550–51.

In the instant actions, plaintiffs challenge the impairment of state laws referred to in *Marquette*. The consequence of combining a broad definition of interest with the exportation principle set forth in *Marquette* is that national banks located in states with liberal credit laws may circumvent consumer protection laws enacted in other states. The exportation principle encourages national banks with large consumer credit operations to relocate to states with liberal credit laws, thus exacerbating the problem. Moreover, plaintiffs point out that because section 85 adopts the law of the state in which a national bank is located, a given state's consumer protection laws are not preempted by a uniform national plan, but by any number of other states' laws. Plaintiffs argue that any consistency would occur only after no consumer protection remains, which, given the innovation of the credit card industry, is a disturbing proposition.

Plaintiffs' policy arguments for preserving an individual state's authority to enforce consumer protection laws have some appeal. This Court, however, cannot act on policy arguments, but must apply the controlling law. In order to circumvent the effects of the exportation principle, plaintiffs must argue successfully for either limiting the definition of interest under section 85 or limiting the scope of the exportation principle set forth in *Marquette*. Plaintiffs argue for both of these approaches. In addition, plaintiffs mount a less direct attack on section 85, arguing that interpreting section 85 to allow the exportation of late and overlimit fees would be unconstitutional. Each of plaintiffs' approaches will be considered in turn.

## B. The Definition of Interest

■ Claims to recover usurious interest paid to a national bank fall within a select category of claims that are so completely preempted that they are considered necessarily federal for removal purposes, even if couched in state law terms. *M. Nahas & Co. v. First Nat. Bank of Hot Springs*, 930 F.2d 608, 612 (8th Cir.1991). Thus, the issue of whether late and overlimit fees are interest within the meaning of section 85 was previously before the Court on plaintiffs' motions to remand. In those motions, plaintiffs argued that "interest" under section 85 was limited to periodic interest charges and did not include flat fees such as late and overlimit fees. Therefore, they argued, their actions could not be construed as actions to recover usurious interest paid to national banks, and did not raise federal claims. Relying on *Fisher* and numerous other cases in which courts had read section 85 to include flat fees, defendants argued that "interest" did not carry the narrow meaning for which plaintiffs argued.

■ As noted above, the Court rejected plaintiffs' argument that the definition of interest under section 85 was limited to periodic interest charges. In reaching this result, the Court relied in large part on *Fisher*. The Court reasoned that in determining that section 85 allowed the national

bank in *Fisher* to charge Iowa residents both Nebraska's numerical interest rate and the flat fee, the Eighth Circuit necessarily considered the flat fee to be "interest" within the meaning of the statute. Given the *Fisher* holding, the Court concluded, plaintiffs' argument that "interest" referred only to the numerical interest rate was unavailing.[1] The Court therefore held that plaintiffs' claims, although couched in state law terms, were necessarily actions to recover usurious interest paid to a national bank that were subject to removal.

▮ Plaintiffs assert again in these motions that section 85 refers only to numerical interest rates. Pls.' Mem. Opp.Summ.J. at 9. That argument, however, was rejected in the Court's prior order, and plaintiffs present nothing to warrant altering the Court's holding that section 85 interest includes charges other than those that are expressed as periodic interest charges. Plaintiffs also seem to reassert the argument that the broad definition of interest applied under the most favored lender doctrine should apply only in instances in which a national bank "borrows" an interest rate allowed to a state lender other than a bank, but not in instances in which the national bank exports that rate. *See, e.g.,* Pls.' Mem.Opp.Summ.J. at 13–14, 25. That argument, too, was rejected in the Court's prior order, on the grounds that nothing in the language of section 85 supports a definition of interest that fluctuates according to whether the national bank seeks to apply the interest to interstate or intrastate transactions, and on the grounds that in *Fisher*, the flat fee was in fact exported.

▮ Plaintiffs go on, however, to raise another argument regarding the definition of interest; they argue that late and overlimit fees are penalties that are conceptually different from interest. In other words, plaintiffs now attempt to distinguish cases such as *Fisher* by arguing that some flat fees are interest, while others are not. Plaintiffs argue that in a usurious transaction, the lender controls payments to provide revenue greater than that allowed by law; late fees, however, are assessed on the basis of the borrower's conduct. Plaintiffs then cite various cases holding that late fees are not usurious. *See, e.g., Lew v. Goodfellow Chrysler–Plymouth, Inc.,* 6 Wash.App. 226, 492 P.2d 258, 262 (1971) (late fees cannot render a transaction usurious because they are within the borrower's control); *Terrell Inc. v. Robert DeShazo Builders, Inc.,* 104 Idaho 518, 661 P.2d 303, 305 (1983) (late fees cannot constitute usury where they do not represent forbearance of an existing debt); *Hayes v. First Nat'l Bank of Memphis,* 256 Ark. 328, 507 S.W.2d 701, 703 (1974) (late fee is a penalty for delinquency that does not render a transaction usurious). Plaintiffs argue that these cases establish that under the common law, late fees (and, by analogy, overlimit fees) are not interest.[2]

1. In reaching this result, the Court also noted that the Office of the Comptroller of the Currency (OCC) has taken the position that late fees and other flat fees are interest within the meaning of section 85. In an *amicus curiae* brief submitted in the instant motions, the OCC continues to take this position. Plaintiffs argue that no deference is owed to the OCC's interpretation of section 85, because the agency's interpretation is manifestly contrary to the statute. Plaintiffs' assertion that courts must not defer to agency decisions that contravene congressional intent is correct. *Chevron, U.S.A. v. Natural Resources Defense Fund,* 467 U.S. 837, 841, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Thus, if the Court were to conclude that Congress did not intend late and overlimit fees to be considered interest within the meaning of section 85, no deference would be owed to the OCC's contrary conclusion.

2. In support of their argument that penalties are not treated as interest, plaintiffs also point to cases in which fees assessed by national banks were challenged on contract theories rather than on a usury theory. *See, e.g., Beasley v. Wells Fargo Bank N.A.,* 235 Cal.App.3d 1383, 1 Cal.Rptr.2d 446 (1991) (late and overlimit fees challenged as invalid under liquidated damages statute); *Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503 (1985) (charges for checks returned for non-sufficient funds challenged as unconscionable and as invalid under liquidated damages statute); *Best v. U.S. Nat'l Bank of Oregon,* 303 Or. 557, 739 P.2d 554 (1987) (same). These cases, however, do not bear on the issue at hand. None of the banks in the cases cited argued that the challenged fees were interest within the meaning of section 85 and the definition of interest was therefore not addressed in any of the cases.

Defendants do not respond directly to plaintiffs' argument that late and overlimit fees are penalties that have traditionally been distinguished from interest. Instead, defendants point out that the Court already held at the jurisdictional stage that the fees at issue here are interest within the meaning of section 85. Defendants then point out that in two other decisions, courts have relied upon the Court's May 28, 1992 order in holding that late and overlimit fees are interest within the meaning of 12 U.S.C. § 1831d(a), which governs the interest rates for loans made by state-chartered banks that are insured by the Federal Deposit Insurance Corporation (FDIC). The first of these decisions is *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818 (1st Cir.1992), in which the United States Court of Appeals for the First Circuit reversed a lower court's holding that late and overlimit fees were not interest within the meaning of section 1831d(a). The second of these decisions is *Hill v. Chemical Bank,* 799 F.Supp. 948 (D.Minn. Aug. 4, 1992), in which the court denied the plaintiffs' motions to remand on the grounds that their claims that late and overlimit fees violated Minnesota law were necessarily federal claims arising under section 1831d(a). In both *Greenwood Trust* and *Hill,* the courts emphasized that the language of section 1831d(a) had been imported from section 85; they then relied on cases construing interest for the purposes of section 85, including this Court's May 28, 1992 order, in determining the meaning of interest under section 1831d. Finally, defendants point out, as they did in the motions to remand, that the Office of the Comptroller of the Currency (OCC) has consistently taken the position that late and overlimit fees are interest under both section 85 and section 1831d. Defendants argue that their motion for summary judgment must be granted unless the Court decides that its May 28, 1992 order, *Hill, Greenwood Trust,* and the OCC rulings have all been wrongly decided.

The Court finds no error in these decisions. Nor is the Court persuaded by plaintiffs' argument regarding the penalty/interest distinction. First, the cases on which plaintiffs rely do not hold that late fees may never be usurious. Rather, they hold that while contracts providing for late fees generally do not implicate usury laws, they may be found to be usurious if the late fees represent an attempt to evade those laws. *Lew,* 6 Wash.App. 226, 492 P.2d 258; *Hayes,* 256 Ark. 328, 507 S.W.2d 701. A second and more fundamental problem with plaintiffs' argument is that they rely on cases from a handful of jurisdictions to support the proposition that late fees cannot be considered interest under "the common law," as if there were a uniform law of usury applicable in all fifty states. The Eighth Circuit has held that under section 85 and its penalty provision, 12 U.S.C. § 86, national banks are subject to both the usury statutes and the decisional law of their home states. *First Nat'l Bank in Mena v. Nowlin,* 509 F.2d 872 (8th Cir.1975). Usury statutes and the case law construing them vary from state to state; that variation is in fact the genesis of these actions. Nothing in section 85 limits a state's authority to determine what controls on interest rates are appropriate; section 85 mandates only that whatever usury laws apply to state-chartered lenders must also apply to the national banks located in the state. The fact that one state considers late fees to be penalties that do not implicate the usury laws does not by itself invalidate another state's determination that late fees are a component of the interest rate.[3] Because plaintiffs' penalty/interest distinction is not persuasive, the Court will adhere to its prior holding that late and overlimit fees are interest within the meaning of section 85.

**C. The Exportation Principle**

 ▆▆ *Marquette,* which established that section 85 allowed for the exportation of interest rates, applies on its face only to periodic interest charges; other types of

---

**3.** Plaintiffs do not argue that under the laws applicable to the defendant banks, late fees are not considered a component of interest. Rath-

er, they argue only that Minnesota's laws regarding late and overlimit fees control defendants' practices.

interest were not at issue in the case. Thus, plaintiffs could prevail by demonstrating that *Marquette* does not apply under the facts of these cases. Defendants argue that because *Marquette* allows exportation of interest rates and because late and overlimit fees are interest, they may legally charge the fees allowed by their home states, and plaintiffs' state law causes of action must fail. Plaintiffs argue that the history of the National Bank Act offers no evidence that Congress intended to preempt states from regulating late and overlimit fees.

The National Bank Act, now codified in section 85, was enacted in 1864. *Marquette*, 439 U.S. at 310, 99 S.Ct. at 546. Plaintiffs argue that the purpose of the Act was to create a national currency, not to create a system of interstate banking. Moreover, plaintiffs argue that the creation of a national currency was necessitated by an intrastate problem: prior to the establishment of a national currency, bankers would issue notes and then locate banks in remote areas, thus making it difficult for note-holders to redeem the notes. In addition to establishing a national currency, the Act provided for redemption centers to be located in major United States cities. *Id.* at 315–16 n. 29, 99 S.Ct. at 549 n. 29. Plaintiffs argue that because the National Bank Act was created to deal with the intrastate problem of redemption, it says nothing about Congress's will regarding interstate banking in the 1990s.

In the Court's view, plaintiffs' analysis has two flaws. First, it is not clear that the problem of redemption of notes was solely an intrastate problem; in any event, Congress's determination to solve the problem by creating a national currency was certainly not an intrastate solution. Second, and more importantly, plaintiffs' version of the purposes and intent behind the National Bank Act is directly at odds with the Supreme Court's determination in *Marquette* that the Act was intended to facilitate a national banking system that included interstate loans. *Marquette*, 439 U.S. at 315–17, 99 S.Ct. at 549–50. Plaintiffs seem to be arguing that *Marquette* is simply wrong, or has at least led to unintended

and undesirable consequences; that argument, however, is more properly addressed to Congress than to this Court.

The Court concludes that *Marquette* does apply to this case. *Marquette* held that national banks may export the interest rates that are lawful in their home states and impose them on credit card customers in other states despite the interest ceilings of those states. The *Marquette* Court reached that holding notwithstanding the fact that the exportation principle erodes state authority to enforce consumer protection laws. Under *Marquette*, defendants are entitled to collect the fees authorized by their home states. Therefore, the Court holds that Minnesota laws regarding late and overlimit fees cannot be enforced against national banks located in other states.

### D. The Constitutionality of Exporting Late and Overlimit Fees

Plaintiffs make two constitutional arguments regarding the exportation of late and overlimit fees. First, they argue that interpreting section 85 to allow exportation of laws governing such fees violates principles of state sovereignty. Plaintiffs point out that if individual states are allowed to define various types of credit card fees as interest and if those definitions of interest are exported under section 85, each state will be allowed to trump other states' consumer protection laws. Moreover, no uniform federal scheme will emerge to replace the gutted state laws, because section 85 merely adopts the usury laws of the state in which a national bank is located. Plaintiffs then point to case law holding that the full faith and credit clause does not require one state to adopt another's conflicting law. *See, e.g., Pacific Employers Ins. Co. v. Industrial Accident Comm'n,* 306 U.S. 493, 501, 59 S.Ct. 629, 632, 83 L.Ed. 940 (1939). They also point to case law allowing a state to enforce its consumer credit code against out-of-state merchandisers notwithstanding the resulting burdens on interstate commerce. *See, e.g., Aldens, Inc. v. Miller,* 610 F.2d 538 (8th Cir.1979), *cert. denied,* 446 U.S. 919,

100 S.Ct. 1853, 64 L.Ed.2d 273 (1980). It logically follows, plaintiffs continue, that one state cannot foist its credit terms upon other states.

The Court concludes that plaintiffs' state sovereignty argument is without merit. The cases plaintiffs cite involve conflicts between two state laws. In contrast, the instant actions involve the interaction of state and federal laws. The *Marquette* Court recognized that the federal law at issue here impaired state power to enforce usury laws. *Marquette*, 439 U.S. at 318, 99 S.Ct. at 550. Provided that Congress acts within its constitutional powers, however, the supremacy clause allows such impairment of state authority.

Perhaps in recognition of this fact, plaintiffs next argue that if Congress intended for individual states to define interest under section 85, the statute represents an unconstitutional delegation of Congress's legislative authority to the states. Plaintiffs point out that under the nondelegation doctrine Congress may not delegate its legislative authority absent standards to guide the exercise of that authority. *Mistretta v. United States*, 488 U.S. 361, 370–74, 109 S.Ct. 647, 654–55, 102 L.Ed.2d 714 (1989). They argue that if section 85 is read to delegate to the states the authority to define interest, it is a delegation unaccompanied by standards that would allow a determination of whether the state definitions comply with Congress's will. In addition, plaintiffs argue that allowing national banks to export the usury laws of their home states subjects Minnesota citizens to laws passed by legislators of other states who are not accountable to Minnesotans.

Plaintiffs' argument ignores the fact that in section 85, Congress did not delegate its legislative authority to the states, but rather adopted state usury laws insofar as they applied to national banks. Plaintiffs themselves concede that Congress may adopt and incorporate into fed-

eral law the laws of a state. In addition, it is important to recognize that while section 85 undoubtedly limits the scope of an individual state's usury laws, it does not preempt those laws in their entirety. Section 85 dictates which laws will govern national banks, but it does not preempt Minnesota's laws as they apply to banks located within Minnesota. In short, the Court concludes that section 85 is neither an unconstitutional infringement upon state sovereignty nor an impermissible delegation of Congress's authority.[4]

Accordingly, based on the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. plaintiffs' motions to dismiss are denied; and

2. defendants' motions for summary judgment are granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**4.** Defendants argue that even if late and overlimit charges were not interest within the meaning of section 85, plaintiffs' state law causes of action would fail, because they represent an impermissible state law interference with lend-

ing powers conferred upon *national* banks by 12 U.S.C. § 24 (Seventh). Because of its resolution of the section 85 issue, the Court does not reach defendants' section 24 (Seventh) argument.