272 N.J. Super. 526 (1994)
640 A.2d 855
JAMES H. HUNTER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF-APPELLANT,
v.
GREENWOOD TRUST COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 27, 1994.
Decided April 22, 1994.
*528 Before Judges SHEBELL, LONG and LANDAU.
Michael D. Donovan of Chimicles, Burt, Jacobsen & McNew, admitted pro hac vice, argued the cause for appellant; Spector Gadon & Rosen, attorneys for appellant (Ann Miller, admitted pro hac vice, of counsel; Paul R. Rosen and Robert L. Grundlock, Jr., on both the brief and the reply brief).
Burt M. Rublin, of Wolf, Block, Schorr and Solis-Cohen, admitted pro hac vice, argued the cause for respondent; Archer & Greiner, attorneys for respondent (Sean T. O'Mara, on the brief); Alan S. Kaplinsky of Wolf, Block, Schorr and Solis-Cohen, admitted pro hac vice, of counsel.
The opinion of the court was delivered by LONG, J.A.D.
Plaintiff, James M. Hunter, here appeals from the trial judge's dismissal of the class action he filed against defendant, Greenwood Trust Company, to invalidate the late charges imposed by defendant on his credit card account.

I
Greenwood is a federally insured bank, chartered under Delaware law, located in New Castle, Delaware. One of the banking services provided by Greenwood is the Discover Card, which cardholders use to charge items and to make purchases by borrowing money from Greenwood on an open-ended credit basis. Greenwood issues its Discover Card to credit card applicants pursuant to a Cardmember Agreement which cardholders receive when they obtain their credit cards.
Among numerous other provisions, the Cardmember Agreement specifies the annual percentage rate finance charge which Greenwood assesses against the outstanding monthly debt balance on its cardholders' accounts. The Cardmember Agreement also provides that if a cardholder fails to make a specified minimum *529 payment on the outstanding debt balance within twenty days of the payment due date stated in a monthly bill, a late charge of ten dollars will be assessed against the cardholder's account. The late charge is added to the cardholder's outstanding balance and the annual percentage rate finance charge is applied to that outstanding balance in subsequent billings. The cardholder may incur multiple ten-dollar late payment charges on his or her account for failure to make the minimum payment during several billing cycles. Greenwood issues its Discover Card to applicants throughout the United States. More than 10,000 residents of New Jersey have received these cards.
Plaintiff is a New Jersey resident who received his Discover Card from Greenwood in 1985. On at least three occasions between 1985 and 1991, plaintiff did not pay the minimum monthly amount specified on his Discover Card bill. Consequently, he incurred at least three ten-dollar late payment charges over the years and those charges were added to his outstanding debt balance in subsequent billings.
Plaintiff filed a complaint, later amended to class action form, which alleged that the ten-dollar late charge Greenwood imposes for a cardholder's failure to pay the minimum monthly amount on an outstanding debt balance violates New Jersey statutory law, specifically provisions of the Retail Installment Sales Act, N.J.S.A. 17:16C-50 and -54 and the Consumer Fraud Act, N.J.S.A. 56:8-2 and -19. Plaintiff also alleged violations of New Jersey common law, specifically breach of contract and conversion, based upon the illegally imposed late charges.
Greenwood moved to dismiss the amended complaint for failure to state a claim upon which relief could be granted. In so moving, it asserted that plaintiff's state law based claims were preempted by section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub.L. No. 96-221, 94 Stat. 132 (codified as section 27 of the Federal Deposit Insurance Act (12 U.S.C.A. § 1831d)) (hereinafter section 521).
*530 The trial judge, Judge Fratto, ruled that by enacting section 521 Congress intended to preempt "the entire area" covering interest rates and the assessment of late payment charges by state-chartered, federally insured banks like Greenwood. Accordingly, he entered an order dismissing plaintiff's amended complaint.
Plaintiff appeals, contending that section 521 preempts state interest laws but excludes late charges from its preemptive scope. He also urges that, even if preemption is applicable to his state statutory claims, his state common law claims should not have been dismissed. We have carefully reviewed this record in light of these contentions and have concluded that there is no warrant for our intervention.

II
In 1864, Congress enacted the National Bank Act (NBA) ch. 106, 13 Stat. 99 (codified, as amended, in scattered sections of the United States Code). Section 85 of the NBA, states in relevant part that:
Any association [national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater.... [12 U.S.C.A. § 85.]
The intent of section 85 was to protect national banks from discriminatory state banking laws. See Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 826 n. 6 (1st Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993). By permitting national banks to charge interest at the rate allowed by a state's law or at a rate tied to the local federal discount rate, Congress prevented states from favoring state-chartered banks to the detriment of national banks as to the amount of interest that could be charged on bank loans. Ibid.
Ten years after the NBA was enacted, the United States Supreme Court construed section 85 in Tiffany v. National Bank, *531 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873). There, the Court announced what became known as the "most favored lender" doctrine, under which national banks could not be placed at a competitive disadvantage with respect to any state-regulated lender. Specifically, Tiffany allowed a national bank to charge interest rates chargeable by natural persons under Missouri law. 85 U.S. at 413, 21 L.Ed. at 863-64. The "most favored lender" doctrine has subsequently been interpreted to give national banks the same interest rate privileges as any competing state institutions, including small loan companies and retail installment sellers. See, e.g., Fisher v. First Nat'l Bank, 538 F.2d 1284, 1289-90 (7th Cir.1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977).
In 1936, the Comptroller of the Currency issued an interpretation of section 85 which administratively recognized the "most favored lender" doctrine as part of federal banking law. See Barkley Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 11.09, at 43 (3d ed. 1990). The "most favored lender" doctrine was later formally incorporated into the Comptroller's regulations covering national banks. 12 C.F.R. § 7.7310(a) (1993).
The margins of the most favored lender doctrine were later tested in Marquette National Bank v. First of Omaha Service Corp., 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). There, First National Bank of Omaha, a national bank chartered in Nebraska, where the allowable interest rate ranged up to eighteen percent on outstanding credit card balances, attempted to "export" that rate to Minnesota, where it had solicited BankAmericard customers and where the allowable interest rate was only twelve percent. Id. at 302-304, 99 S.Ct. at 542-43, 58 L.Ed.2d at 538-39. Minnesota law permitted credit card issuers within its borders to charge an annual usage fee to cardholders to compensate for the relatively low rate of allowable interest. Id. at 303, 99 S.Ct. at 542, 58 L.Ed.2d at 538-39. A national bank located in Minnesota, Marquette National Bank, brought an action to enjoin First of Omaha from soliciting business in and from "exporting" interest *532 rates to Minnesota, asserting that it was losing BankAmericard customers to First of Omaha because Minnesota's low twelve percent interest rate compelled it to charge its cardholder customers a ten-dollar annual fee for use of the card. Id. at 304, 99 S.Ct. at 543, 58 L.Ed.2d at 539. The Minnesota-based national bank was rebuffed by the Minnesota Supreme Court and appealed.
The United States Supreme Court determined that the case was governed by section 85, and ruled that a national bank may charge interest on any loan at the rate allowed by the state where the bank is located. Id. at 313-19, 99 S.Ct. at 547-50, 58 L.Ed.2d at 544-48. The Court unanimously held that First of Omaha could charge its Minnesota customers the interest rate allowed under Nebraska law, even though that rate was greater than the rate allowed in Minnesota for a Minnesota-based national bank. Id. at 318-19, 99 S.Ct. at 550-51, 58 L.Ed.2d at 547-48. Marquette effectively permitted a national bank to "export" its home state's interest rates on credit card accounts to other states.
Within two years of Marquette, the United States experienced a credit upheaval which included soaring interest rates. See Greenwood Trust Co., supra, 971 F.2d at 826. National banks fared well on credit card transactions because they could either "export" favorable home state interest rates or charge interest tied to very high local federal discount rates, pursuant to section 85 of the NBA. Ibid. State-chartered banks, however, could not do so because their interest rates were constrained by the ceilings imposed by the various states' usury laws, some of which were unrealistically low. Ibid. Congress sought to "level the playing field between federally chartered and state-chartered" banks by enacting DIDA, section 521 of which is at issue here. Ibid.
Section 521, codified as 12 U.S.C.A. § 1831d(a), states that:
[i]n order to prevent discrimination against State-chartered [F.D.I.C.-] insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or *533 such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.
This section is an analogue to section 85 of the NBA. Greenwood Trust Co., 971 F.2d at 826-28. Its purpose is to achieve a measure of parity and competitive equity between national banks and state-chartered banks by permitting state-chartered banks to enjoy the same "most favored lender" status that national banks enjoy. Ibid. To assure that equalization, Congress made a conscious choice to incorporate the section 85 standards into DIDA. Id. at 827.
Thus, under DIDA, federally insured state-chartered banks are "most favored lenders" and may charge interest at the rate permitted by any competing lending institution in their home states. See VanderWeyst v. First State Bank, 425 N.W.2d 803, 806 (Minn. 1988) (stating that "[w]e conclude that the `rate allowed' clause should be construed as granting to federally-insured, state-chartered banks most favored lender status. We are persuaded that by using the same `rate allowed' language in ... [the DIDA] that appears in [section 85 of] the National Bank Act, Congress intended to give that status to state insured banks"), cert. denied, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 359 (1988); accord, First Bank v. Miller, 131 Mich. App. 764, 347 N.W.2d 715, 718-20 (1984). To the extent that the home state's law would interfere with a state-chartered bank's interest charges in the home state, those state laws are expressly preempted under section 521 of DIDA. 12 U.S.C.A. § 1831d(a).
Although the United States Supreme Court has not yet definitively ruled on the question of whether state-chartered banks are permitted to "export" their home state's interest rates in the same manner as national banks under Marquette, persuasive authority *534 supports the proposition that the Marquette exportation rationale is equally applicable to state-chartered banks because of the parallels between DIDA § 521 and NBA § 85.
In Greenwood Trust Co. v. Massachusetts, supra, a state-chartered bank located in Delaware sought to impose upon its Massachusetts credit cardholders a late payment charge authorized under Delaware law but forbidden under Massachusetts law. The federal district court ruled that section 521 of DIDA did not preempt Massachusetts law. 971 F.2d at 821. The Delaware bank appealed and the First Circuit reversed. After determining that section 521 of DIDA and section 85 of the NBA are so similar in purpose and wording that courts are required to construe them in pari materia, the court concluded that the "principle of exportation" is "solidly embedded in the language and purpose of both acts." Id. at 827. Therefore, the Marquette rationale is applicable to section 521 and, "[t]o the extent that a law or regulation enacted in a borrower's home state purposes to inhibit the [out-of-state] bank's choice of interest term under section 521, DIDA expressly preempts the state law's operation." Ibid. See also Hill v. Chemical Bank, 799 F. Supp. 948, 951-54 (D.Minn. 1992) (holding that section 521 preempts state law and implicitly recognizing the right of a bank chartered in New York to "export" interest rates and late payment charges to Minnesota borrowers, despite a law that prohibits Minnesota banks from assessing those charges). Thus, according to Greenwood, a state-chartered bank may "export" the interest rate allowed on credit card accounts under the laws of its home state to the borrower's state, pursuant to section 521 and Marquette. See also Watson v. First Union Nat'l Bank, 837 F. Supp. 146 (D.S.C. 1993) (holding that sections 85 and 86 of the National Bank Act, which govern the interest national banks can charge, completely preempt state law claims against national banks for usury; that out-of-state national banks may therefore export interest rate to cardholders in second state; and that credit card overlimit fees are interest under sections 85 and 86); and Goehl v. Mellon Bank, 825 F. Supp. 1239 (E.D.Pa. 1993) (holding that sections 85 and 86 of the National Bank Act *535 completely preempt credit card customers' claims that national banks violated state law by charging late fees in addition to interest and that late fees were interest under the Act). But see Copeland v. MBNA America, N.A, 820 F. Supp. 537 (D.Colo. 1993) (holding that for federal jurisdiction purposes, federal law does not preempt state law because ordinary meaning of word "interest" in sections 85 and 86 of National Bank Act does not include late fees).[1] This is the backdrop against which this case must be evaluated.

III
We turn first to plaintiff's argument that the late payment charges incurred by him did not constitute allowable interest on the outstanding credit card debt balance and thus fall outside the preemptive scope of DIDA. Greenwood addressed an identical issue and concluded that a ten-dollar late payment charge on delinquent Discover card accounts was exportable interest. Greenwood, 971 F.2d at 828-31. We adopt the reasoning which undergirded this conclusion and which we find persuasive. First, Greenwood relied on section 521 "which allows a state bank to charge interest `at the rate allowed by the laws of the State ... where the bank is located.'" Id. at 829. By this provision, the laws of Delaware  Greenwood Trust Company's home state  provide the definition of the term "interest." Ibid. Delaware law explicitly states that delinquency charges imposed on late payments on a revolving credit plan constitute "interest." Del.Code. Ann. tit. 5, § 950 (1988). Plainly then, the charge at issue here as in Greenwood (this is the same bank and the same charge) must be considered "interest" under current Delaware law. Moreover, a Delaware court has previously characterized "interest," in part, to be "the penalty for the delays in the payment of a debt." Phillips v. Phillips, 91 A. 452, 455-56 (Del. Ch. 1914). That definition *536 of the term "interest" brings within its ambit the late payment charge at issue here which can readily be characterized as a penalty.
Nothing in Agostini v. Colonial Trust Co., 36 A.2d 33, 36-37 (Del. Ch. 1945), cited by plaintiff, suggests a contrary result. Agostini's conclusion that interest is compensation, measured by time, for a loan of money is nothing more than a methodology for computing interest to be evaluated under the state usury law. It does not delimit the charges theoretically includable within the concept of interest and cannot circumscribe the after-enacted 1988 Delaware law which specifically includes late charges within the interest rubric.
Further, as Greenwood observed, a number of federal courts have construed the term interest in section 85 of the NBA "to encompass a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate." 971 F.2d at 829. According to Greenwood, when section 521 is read in pari materia with section 85, those lender-imposed fees would also be categorizable as exportable "interest" for state-chartered banks. Id. at 829-30.
More to the point, six federal district court decisions have recently determined that late payment charges on credit cards, like the charge in dispute here, are "interest." See Ament v. PNC Nat'l Bank, 849 F. Supp. 1015 (W.D.Pa. 1994); Watson v. First Union Nat'l Bank, supra, 837 F. Supp. 146; Goehl v. Mellon Bank, supra, 825 F. Supp. 1239; Tikkanen v. Citibank, N.A., 801 F. Supp. 270 (D.Minn. 1992); Hill v. Chemical Bank, supra, 799 F. Supp. 948; and Nelson v. Citibank, N.A., 794 F. Supp. 312 (D.Minn. 1992). Hill is particularly noteworthy because it dealt with a state-chartered bank and because it held that the late payment charge at issue there fell within the preemptive scope of DIDA § 521 because it was "interest."
Plaintiff attempts to distinguish the federal case law relied upon in Greenwood by asserting that those cases deal with "upfront lending charges," rather than with charges for the late payment of *537 the outstanding credit card debt. To us, this distinction is unpersuasive. The point is that the charges characterized as "interest" by the federal courts were not "compensation, measured by time, for a loan of money." Instead, the charges were generally flat fees, like the late payment charge in dispute here. The federal courts effectively categorized those flat fee charges as "interest" for purposes of section 85 of the NBA. Tikkanen, 801 F. Supp. at 276-78; Hill, 799 F. Supp. at 952-54, Nelson, 794 F. Supp. at 316-21. See also Fisher v. First Nat'l Bank, 548 F.2d 255, 258-61 (8th Cir.1977) (where the court impliedly considered a five-dollar flat fee authorized by the national bank's home state for cash advances on a credit card made in a second state to be a component of "interest" which could be imposed by the national bank under the "most favored lender" doctrine).
In light of this federal case law, we think Greenwood correctly concluded that federal common law includes late payment charges within the meaning of the term "interest" for purposes of exportation under the Marquette rationale. 971 F.2d at 825.
Greenwood's final ground for concluding that the bank's ten-dollar late payment charge was exportable interest involved "the rulings and informal opinion letters of the various agencies charged with interpreting the meaning of section 85 and section 521." 971 F.2d at 830. Those rulings and opinion letters almost uniformly indicate that late payment fees are includable as "interest" for purposes of section 85 of the NBA and section 521 of the DIDA. Ibid. (citations omitted).
We are fully satisfied with the reasoning of Greenwood and adopt it here. Section 521 must be construed in pari materia with section 85; such construction compels the conclusion that late payment charges are exportable interest charges under DIDA § 521.

IV
Plaintiff's remaining argument on appeal is that even if his New Jersey statutory claims were properly dismissed, his common *538 law claims for breach of contract and for conversion were not preempted by DIDA § 521. His contention is that these claims survive under the reasoning of Cipollone v. Liggett Group, Inc., ___ U.S. ___, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).
The preemption principle is based on the supremacy clause of the United States Constitution, and requires that state law yield to federal law where the two are not consistent or are in conflict. U.S. Const., art. VI, cl. 2; Feldman v. Lederle Lab., 125 N.J. 117, 133, 592 A.2d 1176 (1991), judgment aff'd as modified, 132 N.J. 339, 625 A.2d 1066 (1993); Miller v. Northwest Airlines, 253 N.J. Super. 618, 622, 602 A.2d 785 (App.Div. 1992). State statutes and common law may both be preempted by federal legislation. Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 77, 577 A.2d 1239 (1990). "The essential question for any preemption analysis is `whether Congress intended that the federal regulation supersede state law.'" Ibid. (quoting Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n, 476 U.S. 355, 369, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369, 382 (1986)). See also Maher v. New Jersey Transit Rail Operations, 125 N.J. 455, 464, 593 A.2d 750 (1991).
Section 521 of DIDA, which states that "any State constitution or statute ... is hereby preempted for the purposes of this section," 12 U.S.C.A. § 1831d(a) (1988), is an express preemption of state law by Congress. The congressional intent underlying that preemption is explicitly set out in the first ten words of section 521, which state that it was enacted "[i]n order to prevent discrimination against State-chartered insured depository institutions." Ibid.
On appeal, plaintiff contends that his common law claims do not fall within the express preemptive ambit of section 521 because that section only preempts a "State constitution or statute." Plaintiff relies for this proposition on Cipollone in which the Supreme Court effectively stated that the term "state law" in a federal statute would include state common law for preemption purposes, but that the term "state statute or regulation" would *539 include only "positive enactments" by state legislatures and agencies. See Cipollone, ___ U.S. at ___, 112 S.Ct. at 2619-21, 120 L.Ed.2d at 425-27. Plaintiff reasons that section 521's preemptive language is expressly targeted only to "positive enactments"  State constitutions and statutes  and not to common law claims. Thus, according to plaintiff, his common law claims are not preempted.
The problem with plaintiff's contention is his implicit assertion that the Cipollone decision provides a bright-line test for the preemption of common law claims. Not so. Cipollone recognized that not all state common law claims were preempted because, for the purposes of the federal act under review there, "the common law is not of a piece." ___ U.S. at ___, 112 S.Ct. at 2621, 120 L.Ed.2d at 427. The Court then differentiated between those common law claims which actually contravened the congressional intent underlying the federal statute and those common law claims which did not contravene that intent; the common law claims which contravened congressional intent were preempted, while those which did not were not. ___ U.S. at ___, 112 S.Ct. at 2621-25, 120 L.Ed.2d at 427-31. Thus, as Cipollone recognized, the intent of Congress is the "ultimate touchstone" of a preemption analysis. ___ U.S. at ___, 112 S.Ct. at 2617, 120 L.Ed.2d at 422.
Here, the question is whether allowance of plaintiff's common law claims for breach of contract and conversion would contravene the congressional intent expressed in DIDA "to prevent discrimination against State-chartered insured depository institutions." 12 U.S.C.A. § 1831d(a). In our view, it would.
This is so because allowance of plaintiff's claims would restrain state-chartered banks which attempted to charge late payment fees to their out-of-state customers. National banks, however, could charge those fees without interference from common law claims like plaintiff's because national banks operate under section 85 of the National Bank Act. See Tikkanen, 801 F. Supp. at 279-80. State-chartered banks would therefore suffer a disadvantage in relation to national banks if plaintiff's common law claims were *540 allowed. This is precisely the type of discriminatory disadvantage which Congress expressly sought to eradicate through DIDA. For this reason, we hold that DIDA should preempt plaintiff's common law claims as well as his statutory claims.
Affirmed.
NOTES
[1] Upon remand, in an unpublished opinion, the state court dismissed plaintiff's claims upon defendant's motion for summary judgment. Copeland v. MBNA America, N.A., No. 92 CV 3909 (Colo.Dist.Ct. Denver July 9, 1993) (appeal filed).