653 A.2d 640

**Jennifer M. MAZAIKA and Daniel A. Mazaika, on behalf of themselves and all others similarly situated, Appellants,**

v.

**BANK ONE, COLUMBUS, N.A., Appellee.**

Superior Court of Pennsylvania.

Argued April 18, 1994.

Filed Dec. 14, 1994.

Petition for Allowance of Appeal Granted May 25, 1995.

Michael P. Malakoff, Pittsburgh, for appellants.

Mark A. Aronchick, Philadelphia, for appellee.

Before CAVANAUGH, WIEAND, McEWEN, CIRILLO, BECK, TAMILIA, KELLY, POPOVICH and SAYLOR, JJ.

McEWEN, Judge:

The essential questions presented in this appeal by the demurrer of appellee [1] are: Did the 38th Congress intend, by the Act of June 3, 1864, to delegate to Ohio the power to define the term "interest" for purposes of preempting all other states' consumer protection laws, and, if, in fact, it did so intend, did the decision of the United States Supreme Court in *Marquette National Bank v. First of Omaha Service Corp.,*

---

1. The preliminary objections filed by appellee recount:
   1. The Complaint, and each and every count thereof, fails to state a cause of action because federal law governs Bank One's lending charges and preempts state law.
   WHEREFORE, Bank One requests that the Court dismiss Plaintiff's Amended Class Action Complaint, and each and every count thereof, with prejudice.

439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), bestow that power upon the Ohio legislature?[2] We pose a negative response to these inquiries and, accordingly, reverse the order which dismissed, with prejudice, the complaint filed by appellants.

Our scope of review in an appeal from an order sustaining preliminary objections in the nature of a demurrer is plenary, and, after accepting as true all material facts set forth in the complaint as well as all inferences reasonably deducible therefrom, we determine whether, on the facts averred, the law precludes with certainty a recovery by plaintiff. Where any doubt exists as to whether a demurrer should be sustained, it must be resolved in favor of overruling the demurrer. *Kyle v. McNamara & Criste*, 506 Pa. 631, 633–34, 487 A.2d 814, 815 (1985); *J.M. White v. Kreithen*, 435 Pa.Super. 115, 119, 644 A.2d 1262, 1264 (1994); *Newtown Village Partnership v. Kimmel*, 424 Pa.Super. 53, 55–56, 621 A.2d 1036, 1037 (1993); *Solomon v. Gibson*, 419 Pa.Super. 284, 286–88, 615 A.2d 367, 368 (1992).

Bank One, Columbus, N.A., is a nationally chartered banking institution located in Columbus, Ohio, which extends open-ended credit accounts to individuals living throughout the United States, including Pennsylvania. Jennifer and Daniel Mazaika are residents of Pennsylvania who obtained a credit card from Bank One pursuant to a card-member agreement which provides for a twenty-four (24%) percent[3] finance

**2.** Due to our resolution of these two issues, we do not reach the question of whether such a delegation of authority by Congress to a single state is permissible under our federal constitution.

**3.** Anyone who is perplexed that banking interests have persuaded the Pennsylvania legislature to approve an interest rate of 18% must surely be appalled to learn that the banking interests have convinced the legislature of Ohio that an interest rate of 25% is neither criminal nor confiscatory. Don Corleone once rasped: "A lawyer with his briefcase can steal more than a hundred men with guns.", Mario Puzo, *The Godfather* p. 51 (Putnam Publishing Group 1969)—one supposes that professional courtesy precluded his allusion to the banker. Having, in this footnote, tamed the advocate, the task of analysis and decision resumes.

charge on all outstanding balances. The cardholder agreement also permits Bank One to charge credit card holders:

An annual fee of twenty ($20) dollars,

A service fee of eighteen ($18) dollars for any checks returned,

A service fee of eighteen ($18) dollars for over-credit-limit charges, and

A service fee of eighteen ($18) dollars if a minimum monthly payment is not received within twenty-five (25) days after the same is due.

Although not termed or computed as interest by appellee in its cardholder agreement or monthly statements, these charges are considered lawful "interest" under Ohio law as a result of the following statutory provision:

[A] bank *may charge*, collect, and receive, *as interest,* other fees and charges that are agreed upon by the bank and the borrower, including, but not limited to, periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, and charges for the return of a dishonored check. . . .

Ohio Revised Code § 1107.262(A) (emphasis supplied).

Appellants contend that Pennsylvania statutory and common law—including the Pennsylvania Goods and Services Installment Sales Act, 69 P.S. §§ 1101 *et seq.*, the Pennsylvania Banking Code of 1965, 7 P.S. §§ 101 *et seq.,* and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201–1 *et seq.*—prohibit the imposition of the aforementioned fees levied by appellee. Appellee argues that such fees, since the Ohio legislature has characterized them in ORC § 1107.262(A) as "interest", may be lawfully charged to Pennsylvania card holders as a result of the preemption, by Section 85 of the National Bank Act, of all state laws purporting to regulate fees charged in connection with such loans.

All parties agree that the interest rate that appellee, a national bank located in Ohio,[4] may lawfully charge its customers, regardless of their domicile, is governed by Section 85 of the National Bank Act of 1864, 13 Stat. 99, which specifically permits a national bank to charge interest "on any loan . . . at the rate allowed by the laws of the state . . . in which the bank is located". 12 U.S.C. § 85.

The National Bank Act was enacted by the 38th Congress in 1864 to place national banks on a competitive footing with state-chartered banks, and sought to prevent state legislatures from discriminating against national banks.[5] Section 85 of the National Bank Act, 12 U.S.C. § 85, more specifically prescribes the amount of interest that a national bank may charge as follows:

> Any association may take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State . . . where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more. . . .

4. A national bank is "located" in the state designated in its "organization certificate". The National Bank Act, Rev.Stat. § 5134, 12 U.S.C. § 22, provides that a national bank must create an "organization certificate" which specifically states "[t]he place where its operations of discount and deposit are to be carried on, designating the State, Territory, or District, and the particular county and city, town, or village." *See: Citizens and Southern National Bank v. Bougas*, 434 U.S. 35, 43, 98 S.Ct. 88, 93, 54 L.Ed.2d 218, 225 (1977); *First National Bank in St. Louis v. State of Missouri*, 263 U.S. 640, 657, 44 S.Ct. 213, 215, 68 L.Ed. 486 (1923).

5. The Court of Appeals for the First Circuit in *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826 n. 6 (1st Cir.1992), noted that:
> Section 85 was originally enacted to shield national banks from state laws that were discriminating against them. *See Marquette Nat'l Bank v. First of Omaha Service Corp.*, *supra*, 439 U.S. at 314–18, 99 S.Ct. at 548–50; Cong.Globe, 38th Cong., 1st Sess. 2126 (1864) (statement of Sen. Sherman). More than a century later, this shield had become a sword wielded by national banks against state-chartered lenders. As we have written before, "irony is no stranger to the law." *Amanullah v. Nelson*, 811 F.2d 1, 18 (1st Cir.1987).

Appellee contends that all state usury and consumer protection laws which purport to regulate any fees which may be charged by a national bank in connection with a loan, so long as they are characterized as interest by a law of the state in which the bank is "located", have been expressly preempted by this section of the National Bank Act. While we agree that the express language of the National Bank Act preempts any attempt by a state legislature to regulate the *rate of interest* which may be charged by a national bank located, for purposes of federal law, in another state, we are not persuaded that all Pennsylvania consumer protection laws which purport to prohibit fees and contingent default charges, such as those at issue in the instant case, have been preempted by the provisions of the National Bank Act governing the rate of interest to be charged by national banks.

## I. PREEMPTION

Appellee's preemption argument arises from Article VI of the U.S. Constitution which provides that the laws enacted by the U.S. Congress "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2.

The path to be followed in pre-emption cases is laid out by our cases. It is accepted that Congress has the authority, in exercising its Article I powers, to preempt state law. In the absence of an express statement by Congress that state law is pre-empted, there are two other bases for finding pre-emption. First, when Congress intends that federal law occupy a given field, state law in that field is pre-empted. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190, 212–213, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983). Second, even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when the state law "stands

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See, e.g., Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984).

*Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 408–09, 565 A.2d 1170, 1174 (1989), *quoting, California v. ARC America Corp.*, 490 U.S. 93, 100–101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989). *Accord: English v. General Electric Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65, 73–74 (1990); *Fidelity Federal Savings & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

■ Banking is an area in which Congress has not evidenced an intent to occupy the entire field to the exclusion of the states, and thus state legislatures may legislate in all areas not expressly or impliedly preempted by federal legislation. *See, e.g., Lewis v. B.T. Investment Managers, Inc.*, 447 U.S. 27, 38, 100 S.Ct. 2009, 2016, 64 L.Ed.2d 702 (1980); *Anderson National Bank v. Luckett*, 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692 (1944); *First National Bank in St. Louis v. State of Missouri, supra,* 263 U.S. at 656, 44 S.Ct. at 215; *Griffith v. Connecticut*, 218 U.S. 563, 569, 31 S.Ct. 132, 133, 54 L.Ed. 1151 (1910), *aff'd.*, 218 U.S. 572, 31 S.Ct. 134, 54 L.Ed. 1155 (1910); *General Motors Corporation v. Abrams*, 897 F.2d 34, 41 (2nd Cir.1990); *Smith v. Mitchell*, 420 Pa.Super. 137, 139–41, 616 A.2d 17, 19 (1992).

[N]ational banks have traditionally been "governed in their daily course of business far more by the laws of the State than of the Nation. All their contracts are governed and construed by State laws." *National Bank v. Commonwealth* (1869) 76 U.S. (9 Wall) 353, 362, 19 L.Ed. 701; see Scott, *The Dual Banking System: A Model of Competition in Regulation* (1977) 30 Stan.L.Rev. 1. As explained in *National State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981 (3d Cir.1980), "[w]hatever may be the history of federal-state relations in other fields, regulation of banking has been one of dual control since the passage of the first

National Bank Act in 1863.... In only a few instances has Congress explicitly preempted state regulation of national banks. More commonly, it has been left to the courts to delineate the proper boundaries of federal and state supervision. The judicial test has been a tolerant one. [National banks'] right to contract, collect debts, and acquire and transfer property are all based on state law." [630 F.2d at 985] Thus the rule is that state laws apply, "the exception being the cessation of the operation of such laws whenever they expressly conflict with the laws of the United States or frustrate the purpose for which the national banks were created, or impair their efficiency to discharge [their] duties...." *McClellan v. Chipman* (1896), 164 U.S. 347, 357, 17 S.Ct. 85, 87, 41 L.Ed. 461.

*Perdue v. Crocker National Bank*, 38 Cal.3d 913, 216 Cal. Rptr. 345, 702 P.2d 503, 521 (1985) (footnotes omitted), appeal dismissed, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986).

Since Congress has not displaced all state legislation affecting national banks, state law will be preempted only

"to the extent that it *actually conflicts* with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress...." [*Silkwood v. Kerr–McGee Corporation*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) ]. *Accord: Pacific Gas & Electric v. St. Energy Resources Conserv[ation & Development Com'n]*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). Defendant bears the burden of persuasion on this issue; "[c]ourts are reluctant to infer preemption, and it is the burden of the party claiming Congress intended to preempt state law to prove it." *Elsworth v. Beech Aircraft Corp.*, 37 Cal.3d 540, 548, 208 Cal.Rptr. 874, 691 P.2d 630 (1984) and cases there cited.

*Perdue v. Crocker National Bank, supra,* 216 Cal.Rptr. at 361–362, 702 P.2d at 519–520 (emphasis supplied).

"Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States (are) not to be superseded by.... Federal Act unless that (is) the clear and manifest purpose of Congress". *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

*Cipollone v. Liggett Group Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992).

Courts must tread cautiously in this arena because the authority to displace a sovereign state's law is "an extraordinary power ... that we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991).

*Greenwood Trust, supra,* 971 F.2d at 823.

As we have noted, all parties to the instant appeal agree that Section 85 of the National Bank Act expressly preempts all attempts by state legislatures to regulate the rate of interest which a national bank may charge in connection with a loan. The disagreement arises over the items and charges which are encompassed within the definition of the term "interest".

The question, at bottom, is one of statutory intent, and we accordingly "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."

*Morales v. TWA Inc.*, 504 U.S. 374, 382, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992) *quoting FMC Corp. v. Holliday*, 498 U.S. 52, 56–58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). Thus, the issue of whether Pennsylvania law has been preempted by Section 85 of the National Bank Act necessarily involves a determination of the intent of the Congress when it employed the term "interest" in drafting Section 85 of the National Bank Act.

## II. "INTEREST": DEFINITION

■ Some courts, in concluding that the term "interest" can include the fees and penalties charged by appellee, have found

that, while the plain meaning of the term "interest", both in 1864 and presently, does not generally include the contingent default charges at issue,[6] the term "interest" must be defined, for purposes of the application of Section 85, by reference to the laws of the state in which the national bank is located. *See, e.g., Tikkanen v. Citibank (South Dakota) N.A.,* 801 F.Supp. 270 (D.Minn.1992). Appellee finds support for this argument in the opinion of the First Circuit Court of Appeals in *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818 (1st Cir.1992).

The Court in *Greenwood* conceded that the sole inquiry before it was ascertaining "what Congress meant by the word 'interest' ". *Id.* at 824. The Court also conceded that "[i]n divining this legislative intent, it is incumbent upon us to 'begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose'. *Morales v. Trans World Airlines,* [504] U.S. [374, 382], 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992), *quoting FMC Corp. v. Holliday,* 498 U.S. 52, 57, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990)." *Greenwood Trust Co. v. Massachusetts, supra,* 971 F.2d at 824.

The *Greenwood* Court, however, disregarding the substantial legislative history recited by the distinguished Judge William F. Young of the District Court, concluded that:

the plain meaning doctrine is not a pedagogical absolute . . . [and] 'does not preclude consideration of *persuasive evidence*' in contradiction to supposedly plain meaning if such evidence exists. *Boston Sand and Gravel Co v. U.S.,* 278 U.S. 41, 48 [49 S.Ct. 52, 54, 73 L.Ed. 170] (1928) (Holmes, J.). Hence a court must always hesitate to construe words

**6.** The complaint in the instant case, which alleges that the annual fee is not included in the monthly APR computation, does not specifically differentiate between the annual fee and the contingent default charges at issue. While the analysis applicable to the annual fee differs from that applicable to the contingent default charges at issue, we find it unnecessary, for purposes of ruling on the demurrer at this stage of the pleadings, to analyze the annual fee separately. *Cf. Northampton National Bank v. Attorney General,* 8 Mass.App. 809, 397 N.E.2d 1149 (1979).

in a statute according to their apparent meaning if to do so
would defeat Congress's discovered intendment.

*Greenwood Trust Co. v. Massachusetts, supra,* 971 F.2d at 825
(emphasis supplied). The persuasive evidence upon which the
Circuit Court in *Greenwood* relied in order to avoid the
ordinary meaning of the term "interest" is, however, quite
elusive and, however deferential we strive to be toward that
tribunal, we find the reasoning of the *Greenwood* Court singu-
larly unpersuasive.

In order to determine the nature of the charges contemplat-
ed by the term "interest", in the absence of an express
definition of the term in the National Bank Act or direct
evidence of the intent of the 38th Congress, settled principles
of statutory construction direct that we look to the ordinary
meaning of the term and consider the then existing federal
common law definitions of "interest". *See, e.g., FMC Corp. v.
Holliday, supra,* 498 U.S. at 57, 111 S.Ct. at 407; *CSX
Transportation Inc. v. Easterwood,* —— U.S. ——, ——, 113
S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993); *Perrin v. United
States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199, 204
(1979); *Burns v. Alcala,* 420 U.S. 575, 580–581, 95 S.Ct. 1180,
1184–85, 43 L.Ed.2d 469, 475 (1975). "[W]here words are
employed in a statute which had at the time a well-known
meaning at common law or in the law of this country[,] they
are *presumed* to have been used in that sense unless the
context compels to the contrary." *Lorillard v. Pons,* 434 U.S.
575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40, 47 (1978) (emphasis
supplied). *Accord: Evans v. First Nat'l Bank of Savannah,*
251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919).

"Interest rate" is commonly defined as "[t]he *percentage* of
an amount of money which is paid for its use for a specified
time." Black's Law Dictionary 730 (5th ed. 1979) (emphasis
added). Similarly, "interest" has been defined as "a charge
for borrowed money[,] *generally a percentage of the amount
borrowed.*" Webster's Ninth New Collegiate Dictionary 630
(1989) (emphasis added). It would appear beyond peradven-
ture that the plain and ordinary meaning of the term "inter-
est" or "interest rate" does not include late fees, over credit

limit charges, or the like which are not levied on a percentage basis.[7] *Copeland v. MBNA America, N.A.*, 820 F.Supp. 537, 540 (D.Colo.1993). *See, e.g., Perry v. Stewart Title Co.*, 756 F.2d 1197, 1207–1208 (5th Cir.1985), on rehearing, 761 F.2d 237 (5th Cir.1985); *Seiter v. Veytia*, 756 S.W.2d 303 (Tex. 1988); *Perdue v. Crocker National Bank*, 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503 (Cal.1985), *appeal dismissed*, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986).[8] In fact, it would appear that even the Ohio legislature is of the opinion that the term "interest" does not generally include "periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, and charges for the return of a dishonored check", or presumably, enactment of Section 1107.262(A)[9] of the Ohio Code would have been unnecessary.

One is compelled to such an inference since, although Section 1107.261 of the Ohio Revised Code provides for a maximum annual percentage rate of 25%,[10] no definition of "interest"—for purposes of the application of the 25% maximum rate of interest—is provided in Section 1107.261. If one

7. The Supreme Court utilized, in *Marquette Nat'l Bank v. First of Omaha Service Corp., supra*, the terms "interest rate" and "rate of interest", referring to a periodic rate of interest charged on a daily outstanding balance, without pausing to define that term. Justice Brennan did note, however, that "unlike the Nebraska bank, Marquette was forced by the *low rate of interest* permissible under Minnesota law to charge a $10 annual *fee* for the use of credit cards." *Marquette, supra*, 439 U.S. at 304, 99 S.Ct. at 543 (emphasis supplied).

8. This issue has been addressed in a most insightful and enjoyable opinion by the learned Philadelphia County Common Pleas Court Judge Bernard J. Avellino in *In Re: Citibank (South Dakota) Credit Card Litigation*, presently pending before this Court at No. 1673 PHL 1994.

9. See page 3 *supra* for text of ORC 1107.262(A).

10. Section 1107.261 of the Ohio Revised Code provides:

§ 1107.261 Alternative interest or finance charge rates permitted · As an alternative to the interest permitted in section 1107.26 of the Revised Code and to the finance charges permitted in division (D) of section 1107.27 of the Revised Code, a bank may contract for and receive interest or finance charges at any rate or rates agreed upon or consented to by the parties to the loan contract or revolving credit agreement, *but not exceeding an annual percentage rate of twenty-five per cent.* (emphasis supplied)

accepts the proposition that the term "interest" in Ohio, pursuant to ORC 1107.262(A), always includes "periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, and charges for the return of a dishonored check", it logically follows that appellee would be in violation of *Ohio* usury laws in those instances where the fees at issue, when imposed in combination with the 24% rate of interest applied by appellee to all outstanding credit balances, exceed an effective rate of 25%.

The Ohio legislature, however, having caused the word "interest" in Section 1107.262(A) to include "periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, and charges for the return of a dishonored check," proceeded to provide that such fees and charges, although designated as "interest", could not be "included in the computation of the annual percentage rate or *the rates of interest* or finance charges for purposes of determining whether the maximum annual percentage rate or the maximum rate or rates of interest.... have been exceeded." ORC § 1107.262(A) (emphasis supplied). Thus, even under Ohio law, the fees and contingent default charges levied by appellee are not *interest* except for one, unique purpose.

In any event, since the *Greenwood* Court failed to reveal the "persuasive evidence" upon which it relied to avoid the "ordinary meaning" of the term "interest", we are simply unable to find that Congress, when it used the phrase "interest at the rate" in enacting Section 85 of the National Bank Act, intended anything other than the ordinary and popular meaning of the word "interest", which a person of average intelligence and experience would understand.[11]

11. Section 85 permits a national bank to charge its home state's rate of interest or, in the alternative, "a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, *whichever may be greater,* and no more...." 12 U.S.C. § 85 (emphasis supplied). On March 25, 1994, the discount rate on ninety-day commercial paper, rated A–1 and P–1, was 4.1%, resulting in an effective alternative interest rate of 5.1%! Appellants have alleged in their

## III.  EXPORTATION  PRINCIPLE

■  Appellee contends, however, that even if the plain meaning of the term "interest" in Section 85 does not include the contingent default charges at issue herein,[12] the decision of the U.S. Supreme Court in *Marquette* requires that we apply the Ohio definition of interest in ruling on the demurrer. More specifically, appellee, while conceding that the exportation principle as enunciated by the Supreme Court in *Marquette* is expressly applicable only to periodic interest rates, urges that because (1) *Marquette* provides for the exportation of interest rates by national banks, and (2) Ohio has characterized contingent default charges as well as annual fees as interest, Pennsylvania's consumer protection laws prohibiting such fees are preempted by the Ohio definition of the term "interest".

The Supreme Court in *Marquette* was called upon to decide whether Omaha Bank, a national bank authorized by 12 U.S.C. § 85 to charge interest on any loan at the rate allowed by the laws of Nebraska, the state in which the bank was located, was "entitled to charge its Minnesota customers the rate of inter-

complaint that the delegation to Ohio of the right to define the term "interest" has enabled appellee, in addition to the 24% rate of interest which it charges on outstanding balances, to charge a variety of contingent default charges which can amount to an effective rate of interest in excess of 200% of the outstanding balance.

12.  A majority of courts which have found state law prohibiting such charges to have been preempted by Section 85 have done so in reliance on *Marquette* and not as a result of a finding that the term "interest" was intended by the 38th Congress to include such charges.  The eminent Judge Maurice B. Cohill, Jr., of the Western District of Pennsylvania, relying upon *Greenwood* and the opinion of the Court of Common Pleas in the instant case, observed that:

Plaintiffs ask that we ignore recent developments and inspect the case law prior to 1992, and that, upon doing so, we will deny defendants' motions because *at common law, penalty charges were not the same as "interest" because they were not required by the lender as compensation for the loan,* and that single sum late fees were not usurious because they were not "interest."  . . . .  Essentially, *plaintiffs are arguing that because penalties have historically never been classified as interest,* the National Bank Act and DIDA do not regulate such penalties, and Pennsylvania state law does.

*Ament v. PNC National Bank,* 849 F.Supp. 1015, 1018–1019 (WD Pa.1994) (emphasis supplied).

est authorized by Nebraska law". *Marquette, supra,* 439 U.S. at 308, 99 S.Ct. at 545. The Supreme Court specifically noted that Omaha Bank operated "no branch banks in Minnesota, ... nor apparently could it under federal law". *Marquette, supra,* 439 U.S. at 309, 99 S.Ct. at 546. Omaha Bank, pursuant to Nebraska law, was permitted to charge 18% interest per year on the first $999.99 of all balances, and 12% interest per year on all amounts over $1000.00. By contrast, Minnesota law permitted an interest rate of 12% but "[t]o compensate for the *reduced interest,* Minnesota law permit[ted] banks to charge annual *fees* of up to $15.00 for the privilege of using a bank credit card". *Marquette, supra,* 439 U.S. at 302–303, 99 S.Ct. at 542–543 (emphasis supplied). It was upon these essential facts that the Supreme Court held that Omaha Bank, "located" in Nebraska, could lawfully charge all of its customers, regardless of *their* domicile, the *rate of interest* allowed by the state of Nebraska. The Court, based upon the express words of the statute, refused to find an intent on the part of Congress to "exempt interstate loans from the reach of [Section 85]." *Marquette, supra,* 439 U.S. at 318, 99 S.Ct. at 550. The Court in *Marquette* thus concluded that the Nebraska rate of interest was applicable to all of Omaha Bank's transactions where Omaha Bank was located, situated, and transacted *all* of its business operations in the state of Nebraska. *See: Marquette, supra,* 439 U.S. at 309 n. 20, 99 S.Ct. at 546 n. 20.

It is thereby apparent that *Marquette* involved a narrow issue, namely, whether a national bank, located in a single state, had to provide different *rates* of interest to its customers who had domiciles different from the bank. *Marquette* did *not* involve fees or penalties or any other loan terms. Moreover, the legendary Justice William J. Brennan, as he proclaimed the exportation principle for the unanimous *Marquette* Court, cited to the following language contained in *Seattle Trust & Savings Bank v. Bank of California,* 492 F.2d 48 (9th Cir.1974) *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974):

If the words "located" or "situated" in these provisions [12 U.S.C. §§ 24, 36, 85, 90, 92, 371] were to refer to the site of Bank of California's corporate headquarters in San Francisco, then the Bank's performance in the State of Washington of many essential banking functions would be governed by the laws of California. The law of California would control even when these functions are carried on by non-California branches in dealings with local customers and in competition with banks subject to local state statutory limitations. Such an anomaly could not have been intended by Congress in establishing national banking policy through the National Banking Act.

*Seattle Trust & Savings Bank v. Bank of California*, supra, 492 F.2d at 51.

Thus it is that, unlike many of our brethren in other jurisdictions,[13] we are unable to find in *Marquette* support for the premise that Section 85 was intended to or has been interpreted in *Marquette* to preempt all state consumer protection laws which seek to regulate aspects of consumer loan transactions other than rates of interest, at the whim of the Ohio state legislature.[14]

We are further mindful that the United States Supreme Court in *Marquette* noted that when the National Bank Act was enacted on June 3, 1864, a national bank was required to specifically state in its organizational certificate "the place where its operations of discount and deposit are to be carried

13. *See, e.g.:*
    *Ament v. PNC National Bank*, 849 F.Supp. 1015 (1994).
    *Goehl v. Mellon Bank*, 825 F.Supp. 1239 (E.D.Pa.1993).
    *Hill v. Chemical Bank*, 799 F.Supp. 948 (D.Minn.1992).
    *Hunter v. Greenwood Trust Co.*, 272 N.J.Super. 526, 640 A.2d 855 (1994).
    *Nelson v. Citibank*, 794 F.Supp. 312 (D.Minn.1992).
    *Sherman v. Citibank*, 272 N.J.Super. 435, 640 A.2d 325 (1994).

14. The Court in *Greenwood*, citing to four Circuit Court cases and one District Court case, conceded that "[f]airly read, these opinions expand the scope of Section 85 preemption...." *Greenwood* at 830. The thought occurs that these cases, which are not binding on this Court, have improperly expanded the preemptive scope of Section 85 well beyond what was intended by the 38th Congress or contemplated by the United States Supreme Court in *Marquette*.

on, designating the State, Territory, or District, and the particular county and city, town or village". *Marquette, supra,* 439 U.S. at 301 n. 2, 99 S.Ct. at 542 n. 2, *quoting* 12 U.S.C. § 22.

> [A]t the time the 1864 Act was passed, the activities of a national bank were restricted to one particular location. That Act's provisions to the effect that the organization certificate (as 12 U.S.C. § 22 also requires today) shall specifically state "the particular county and city, town, or village" of its place of operations, 13 Stat. 101, and that the bank's "usual business shall be transacted at an office or banking house located in the place specified in its organization certificate," 13 Stat. 102 (cf. 12 U.S.C. § 81), indicated as much. National banks (other, perhaps, than those that originally were state banks with existing branches) were not permitted to engage in branch banking until 1927, when the McFadden Act, 44 Stat. Pt. 2, p. 1224, was passed; moreover, the McFadden Act allowed national banks to "establish" branches only if permitted by state law, and only "within the limits of the city, town, or village in which said association is situated," *id.,* at 1228. It was not until 1933 that Congress approved, upon specified conditions, national bank branches beyond the place named in the charter. 48 Stat. 189–190.
>
> \* \* \* \* \* \*
>
> It suffices to stress that Congress did not contemplate today's national banking system, replete with branches, when it formulated the 1864 Act; [and] that there are no sure indicators of 1864 congressional intent with respect to a banking system that did not then exist....

*Citizens and Southern National Bank v. Bougas,* 434 U.S. 35, 42–43, 98 S.Ct. 88, 93, 54 L.Ed.2d 218 (1977).

Moreover, *Marquette* declared that the intent of the 38th Congress, in providing that national banks "may ... charge ... *interest* at the *rate* allowed by the laws of the State, Territory or District where the bank is located, ... and no more ...", 12 U.S.C. § 85 (emphasis supplied), was to allow

national banks to compete with state-chartered banks and to give certain " 'advantages to National banks over their State competitors' ". *Marquette, supra*, 439 U.S. at 314, 99 S.Ct. at 548, *quoting Tiffany v. National Bank of Missouri*, 85 U.S. (18 Wall.) 409, 413, 21 L.Ed. 862 (1873). *See also: First National Bank in Plant City, Florida v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). Surely the Congress could not then have logically intended, via Section 85 of the National Bank Act, to bestow upon a single state the authority to declare that the phrase "rate of interest" and the term "interest" are ambiguous expressions, thereby permitting a single state to define the term "interest" to include items which have never been included in the computation of "interest" [15] as that term is commonly understood and thereby void all other states' validly enacted consumer protection laws.

Appellee argues, however, even while acknowledging that *Marquette* dealt with interest rates as that term is commonly understood *and not* service fees or contingent default charges,

**15.** *See, e.g.:* Truth In Lending Act, 15 U.S.C. § 1601 *et seq.;* Regulation Z, 12 C.F.R. §§ 226.1 *et seq.* The Truth In Lending Act definition of "finance charge" includes "interest", but specifically excludes many of the contingent default fees which the Ohio definition of "interest" incorporates. *See:* 12 C.F.R. §§ 226.4(b)(1), (c)(1)–(3). Similarly, the Depository Institution Deregulation and Monetary Control Act of 1980, 94 Stat. 132, which preempted state usury laws to the extent that such laws limited the *rate of interest* national banks could collect on mortgages, left intact state consumer protection laws limiting other charges associated with mortgage loans.

> The Senate committee report on the 1980 Act states that "[i]n exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers." (Sen.Rep. No. 96–368, 1st Sess., p. 19 (1979).) Thus the committee intended to leave many features of the contract between a bank and a borrower to be governed by state law, including state provisions which placed a limit on the amount the bank could charge.

*Perdue, supra*, 216 Cal.Rptr. at 364 n. 37, 702 P.2d at 522 n. 37 (emphasis supplied). *See also* regulations promulgated pursuant to the Depository Institution Deregulation and Monetary Control Act of 1980 at 12 C.F.R. § 590.3(c) (1989) (*"Nothing in this section preempts limitations in state laws on prepayment charges, attorneys' fees, late charges or other provisions designed to protect borrowers."*) (emphasis supplied).

that, solely by authority of Section 85 of the National Bank Act, any fees, no matter how far removed from a charge based on the time-value of money, so long as they are permitted by Ohio law and labeled "interest", may be applied, in derogation of all state consumer protection laws to the contrary, to all interstate loans.[16] We cannot agree and refuse to permit appellee, in the clothing of sheep nibbling upon "interest", to swallow whole the Pennsylvania Goods and Services Installment Sales Act,[17] the Pennsylvania Banking Code of 1965,[18] and the Pennsylvania Unfair Trade Practices and Consumer Protection Law.[19] Rather, we are compelled to the view that federal law, and not state law, must be applied in determining whether the contingent penalties permitted by the State of Ohio under the label of "interest" can be considered "interest" charges for purposes of the application of Section 85. *See: First National Bank in Plant City Florida v. Dickinson, supra.* We find support for this position in the ruling of the United States Supreme Court in *First Nat'l Bank in Plant City, Florida v. Dickinson, supra,* where the Supreme Court was called upon to determine, for purposes of the McFadden Act,[20] what constituted a "branch bank". The Court concluded that, absent a clear Congressional indication to the contrary, the state of Florida could not be allowed to define the term, opining:

16. The *Greenwood* Court suggested that if a state were to enact legislation which crossed an imaginary line of intellectual decency, the statute would not be found controlling:

   This "does not mean that a State would be entitled to use [a statutory term] in a way entirely strange to those familiar with its ordinary usage, but at least to the extent there are permissible variations in the ordinary concept [of that term] we [may] deem state law controlling." *Greenwood, supra,* 971 F.2d at 829, *quoting DeSylva v. Ballentine,* 351 U.S. 570, 581, 76 S.Ct. 974, 980, 100 L.Ed. 1415 (1956). The *Greenwood* Court, however, did not suggest any parameters for measuring or quantifying how strange a usage would have to be in order to be found invalid.

17. 69 P.S. § 1101 *et seq.*

18. 7 P.S. § 101 *et seq.*

19. 73 P.S. § 201–1 *et seq.*

20. The McFadden Act of 1927, 44 Stat. 1228, *as amended,* 12 U.S.C. § 36.

We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes "branch banking" must control the content of the federal definition of § 36(f). Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, [*First National Bank of Logan, Utah v. Walker Bank & Trust Co.*, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966) ], for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the states to define the content of the term "branch" would make them the sole judges of their own powers.

*First Nat'l Bank in Plant City, Florida v. Dickinson, supra*, 396 U.S. at 133, 90 S.Ct. at 343 (footnote omitted). The facts of the instant case beg for application of this same analysis.

The 103rd Congress has recently enacted the Riegle–Neal Interstate Banking and Branching Efficiency Act of 1994,[21] which expressly provides that a national bank is bound, as to operations carried on in a particular state, by the consumer protection laws of each state in which it operates any branches. While the intent of the 103rd Congress can shed no light upon that of an earlier Congress, we believe the intent of the 38th Congress, when it enacted the Bank Act of 1864, was not unlike that of the 103rd Congress in enacting the Riegle–Neal Interstate Banking and Branching Act of 1994—national banks, while favorites of the government, were not meant to be exempted from all state laws designed to protect consumers from overreaching on the part of banking institutions.

Since Section 85 of the National Bank Act does not, in our view, preempt all common law and state consumer protection laws dealing with charges and penalties not commonly includ-

21. The Senate Committee Report on the Riegle–Neal Interstate Banking and Branching Act of 1994, 103 P.L. 328, 108 Stat. 2338, includes an excellent history of interstate banking in the United States as well as an explanation of the effect of the 1994 Act upon state law, and in particular, upon consumer protection laws such as those at issue herein. Certain pertinent portions of the Act and of the Committee Report are attached to the recorded majority opinion but are not here reproduced.

ed in the term "interest", we reverse the order which sustained the demurrer of appellee and remand for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

CIRILLO, J., files a concurring opinion.

WIEAND, J., files a dissenting opinion in which POPOVICH, and SAYLOR, JJ., join.

CIRILLO, Judge, concurring:

I concur with the majority insofar as it finds that nothing in the National Bank Act (NBA), 12 U.S.C. § 21 *et seq.*, provides the kind of unambiguous evidence of congressional intent necessary to displace this Commonwealth's consumer protection laws prohibiting late payment fees, annual fees, return check fees, etc. I would journey one step further, however, and hold that allowing Ohio's definition of "interest rate" or "rate of interest" to preempt Pennsylvania's consumer protection laws would amount to an unconstitutional delegation of Congressional power to the State of Ohio's legislature. For this reason, I must write separately.

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Generally, the states have full power to regulate within their limits, matters of internal police, which include whatever will promote the peace, comfort, convenience, and prosperity of their people (collectively referred to as the states' police powers). *See Escanaba Co. v. Chicago*, 107 U.S. 678, 2 S.Ct. 185, 27 L.Ed. 442 (1883).

Banks and banking are areas which have traditionally fallen under the ambit of the states' police powers. Because our country has traditionally favored widely dispersed control of banking, the United States Supreme Court has held that "banking and related financial activities are of profound local

concern." *Northeast Bancorp v. Board of Governors of the Federal Reserve Sys.,* 472 U.S. 159, 177, 105 S.Ct. 2545, 2555, 86 L.Ed.2d 112 (1985); *see also Lewis v. BT Invest. Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (noting that as a matter of history and present commercial reality, banking and related financial activities are of profound local concern).

Similarly, the courts of this Commonwealth have held that banking and the regulation of interest rates are subjects squarely within the police powers of the Commonwealth. *Smith v. Mitchell,* 420 Pa.Super. 137, 140, 616 A.2d 17, 19 (1992) (citing *Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 454–56, 21 A.2d 53, 58 (1941)). At common law, the taking of any interest, whatever the percentage, was illegal. The present right to impose or charge interest is derived from state statutory authority. It naturally follows, therefore, that the right or privilege to charge interest and other concomitant fees are subject to state legislative control. *See Equitable Loan Society, Inc. v. Bell,* 339 Pa. 449, 14 A.2d 316 (1940); *Adinolfi v. Hazlett,* 242 Pa. 25, 88 A. 869 (1913).

> It is elementary that the subject of the maximum amount to be charged ... for the use of money loaned within the jurisdiction of the state is one within the police power of such state.

*Smith,* 420 Pa.Super. at 141, 616 A.2d at 19 (quoting *Griffith v. Connecticut,* 218 U.S. 563, 569, 31 S.Ct. 132, 133, 54 L.Ed. 1151 (1910) and *Watson v. Maryland,* 218 U.S. 173, 176, 30 S.Ct. 644, 646, 54 L.Ed. 987 (1910)). Regarding the necessity of state action in areas of extreme local concern, Thomas Jefferson once pronounced that, "[w]ere we directed from Washington when to sow, and when to reap, we should soon want bread." Thomas Jefferson, *Autobiography* (1853).

The states' police powers, including this Commonwealth's authority to regulate the rates of interest and other ancillary fees charged against consumer loans and credit cards, however, are not without limitation. The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ...

any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. State police powers, therefore, cannot embrace a subject textually committed to Congress by the United States Constitution, nor can they defeat or impair statutes passed by Congress in order to carry out the powers granted to it. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 361, 49 L.Ed. 643 (1905).

When "the field which Congress is said to have preempted has been traditionally occupied by the States [e.g., within the states' police powers—banking, consumer protection, etc.] . . . 'we start with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cippollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)); *see also CSX Transp., Inc. v. Easterwood*, —— U.S. ——, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The touchstone of a preemption analysis, therefore, turns on congressional intent. *Cippollone*, —— U.S. at ——, 112 S.Ct. at 2617, 120 L.Ed.2d at 422 (citing *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)); *see also Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (holding that preemption is not foreclosed by the fact that the federal statute intrudes into the range of subjects over which the states have traditionally exercised their police powers if Congress' intent to displace state law is clear).

Generally, Congress' intention to preempt may be either express or implied. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Specifically, state law is preempted by federal law in three circumstances:

(1) where Congress explicitly defines the extent to which its enactments preempt state law;

(2) in the absence of explicit statutory language, where Congress regulates conduct in a field that Congress intended the federal government to occupy exclusively; and

(3) where state law actually conflicts with federal law.

*English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).

Here, the parties and amicus curiae cannot dispute that Congress, in enacting the NBA, neither expressly preempted state consumer protection laws or banking laws, nor intended the federal government to exclusively occupy the field. Preemption applies, therefore, only if Pennsylvania's consumer protection laws "actually conflict" with Section 85 of the NBA. *English, supra.*

To ascertain whether Pennsylvania's laws actually conflict with and are, therefore, preempted by Section 85, we must look to the intent of Congress, the plain and ordinary meanings of Section 85's terms, and the federal common law. After so doing, I find that Bank One has not met its burden of showing that Pennsylvania's consumer protection laws conflict with Section 85 of the NBA or that Congress' "clear and manifest purpose" in enacting Section 85 was to preempt state contract law prohibiting late payment fees, annual fees, return check fees, etc. *Cippollone, supra; Rice, supra.*

The pertinent language of Section 85 of the NBA provides:

Any association may take, receive, and charge on any loan or discount made, ... or other evidence of debt, *interest at the rate allowed by the laws of the State* ... where the bank is located.

12 U.S.C. § 85 (emphasis added). Section 85 of the NBA has been referred to by many courts as the "most favored lender doctrine:"

[Section] 85 was designed by Congress to place national banks on a plane of at least competitive equality with other lenders in the respective states, and, indeed, to give national banks a possible advantage over state banks in the field of interest rates. Thus, a national bank is not limited to the interest rate that a state bank may charge with respect to a particular type of loan if another lender in the state is permitted to charge a higher rate of interest on the same

type of loan. In that situation the national bank may charge the higher rate.

*Fisher v. First National Bank*, 548 F.2d 255, 259 (8th Cir. 1977). Section 85 was enacted, therefore, to eliminate state control over the interest rates charged by federally chartered commercial banks. *See M. Nahas & Co. v. First Nat'l Bank*, 930 F.2d 608 (8th Cir.1991); *Brown v. First Nat'l City Bank*, 503 F.2d 114 (2d Cir.1974).

Section 85 of the NBA has also been interpreted as permitting national banks to charge customers throughout the country the **rates of interest** permitted in the state where it is located—the "exportation principle." *See Marquette Nat'l Bank v. First of Omaha Service Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978) and *Fisher, supra*. The Court in *Marquette* held that national banks need not comply with any other state's **interest rate** law when doing business in a state other than the one in which they are located. *Marquette*, 439 U.S. at 307–13, 99 S.Ct. at 545–48. This holding, in effect, created a *de facto* national interest rate.

The impact of the *Marquette* decision on consumer credit business has been overwhelming. While some states continue to enact consumer protection legislation, *see, e.g.,* 69 P.S. § 1101 *et seq.*, and 73 P.S. § 201–1 *et seq.*,[1] others view the

---

1. The particular Pennsylvania law at issue is the Pennsylvania Goods and Services Installment Sales Act (the Sales Act). 69 P.S. § 1101 *et seq.* (1994). Among other things, the Sales Act comprehensively regulates credit card transactions insofar as they involve the purchase of goods and/or services within Pennsylvania. 69 P.S. § 1103. While the Sales Act permits a credit card issuer to impose a nominal service charge, 69 P.S. § 1904, **the Act expressly prohibits the imposition of any** "fee[s], expense[s], delinquenc[ies], collection[s] or other charge[s]." 69 P.S. § 1906 (emphasis added).

   Examples of other state statutes which regulate either bank credit cards or retailer credit cards via the adoption of the Uniform Consumer Credit Code or similar provisions include: Cal.Civ.Code §§ 1802.19, 1810.1–1810.12 (1985 & Supp.1994); Colo.Rev.Stat. §§ 5–1–101 to 5–9–103 (1973 & Supp.1993); Idaho Code §§ 28–41–101 to 28–49–107 (Supp.1993); Ind.Code Ann. §§ 24–4.5–1–101 to 24–4.5–6–203 (1982 & Supp.1993); Iowa Code Ann. §§ 537.1101–.8101 (1987 & Supp.1994); Kan.Stat.Ann. §§ 16a–1–101 to 16a–9–102 (1988 & Supp.1993); Me. Rev.Stat.Ann. tit. 9–A, §§ 1–101 to 11–121 (1980 & Supp.1994); Okla. .Stat.Ann. tit. 14A, §§ 1–101 to 9–103 (1983 & Supp.1994); S.C.Code

*Marquette* decision as an opportunity for economic development. By relaxing interest rates and usury laws generally, these states assist their resident national banks in nationwide consumer credit transactions and allure out-of-state bank holding company subsidiaries into their jurisdictions for the same purpose. *See* Robert A. Burgess & Monica A. Ciolfi, *Exportation or Exploitation? A State Regulators' View of Interstate Credit Card Transactions,* 42 Bus.Law. 929 (1987). The effect of *Marquette,* therefore, has been to deny millions of consumers the protections of the laws of the states in which they reside. It is my belief that in order to ensure and stimulate public confidence and participation in commercial transactions, interstate lenders, like Bank One, must be compelled to comply with all consumer protection laws and/or regulations other than the **rate** laws in the states in which their borrowing consumers reside unless and until Congress speaks resoundingly to the contrary.

The NBA does not expressly define "interest rates" or "rates of interest" as used in Section 85. Additionally, there is nothing in the legislative history of the NBA from which we could glean a possible congressional intent to include late fees, return check fees, over-credit-limit charges, etc. within the definition of "rate of interest." Absent an express definition or clear congressional intent, in order to determine whether the Pennsylvania consumer protection laws are preempted, we must look to the ordinary meaning of the term(s) and consider the then existing federal common law definitions. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Perrin v. United States,* 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); *Burns v. Alcala,* 420 U.S. 575, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975). "[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country[,] they are presumed to have been used in that sense unless the context compels to the contrary." *Lorillard v. Pons,* 434 U.S.

Ann. §§ 37–1–101 to 37–10–106 (1989 & Supp.1993); Utah Code Ann. §§ 70C–1–101 to 70C–9–102 (1990 & Supp.1993); Wis.Stat.Ann. §§ 421.101–427.105 (1988 & Supp.1994); Wyo.Stat. §§ 40–14–101 to 40–14–702 (1977 & Supp.1993).

575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978); *see also Evans v. First Nat'l Bank,* 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919) (holding that federal law completely defines what constitutes the taking of usury by a national bank, referring to state law only to determine the maximum permitted rate).

"Interest rate" is defined as "[t]he **percentage** of an amount of money which is paid for its use for a specified time." Black's Law Dictionary 730 (5th ed. 1979) (emphasis added). Similarly, "interest" is defined as "a charge for borrowed money[,] **generally a percentage of the amount borrowed.**" Webster's Ninth New Collegiate Dictionary 630 (1989) (emphasis added). The plain and ordinary meaning of "interest" or "interest rate," therefore, does not include late fees, annual fees, or the like. *FMC Corp., supra.*

Similarly, in common parlance, "interest rate" or "rate of interest" has a very narrow meaning. For example, when one is asked what interest rate he or she is paying on a loan, the response is, "eleven and one-half percent" or "ten and three-eighths percent." If it is a real estate loan, the response may be, "nine and one-half percent, and two points." Conversely, lay persons are not likely to associate "interest rate" with late payment fees, return check fees, etc., because those fees are usually contingent upon the borrower's default, and are not part of the "interest" paid to obtain the funds.

Turning now to the federal common law interpretation of "interest rates" or "rates of interest," the trial court relied, in large part, on *Greenwood Trust Co. v. Commonwealth of Mass.,* 971 F.2d 818 (1st Cir.1992) in finding that Pennsylvania's laws prohibiting the assessment of annual fees, late payment fees, and the like, are preempted by Section 85, because Ohio law, the state in which Bank One is "located," permits such fees and charges. This reliance is misplaced in that *Greenwood Trust* and its progeny fail to distinguish between interest and/or interest rates, the amount charged for the use of money, and contingent penalty fees, the amount imposed upon a contractual default.

Prior to the passage of the NBA in 1864, the United States Supreme Court examined the dichotomy between "interest rates" and "contingent default charges." In *Lloyd v. Scott*, 29 U.S. (9 Pet.) 205, 7 L.Ed. 833 (1830), the Court held that contingent default charges (e.g., late fees, etc.) were not "interest:"

If a party agree[s] to pay a specific sum exceeding the lawful interest, provided he do[es] not pay the principal by a day certain, it is not usury. By a punctual payment of the principal, he may avoid the payment of the sum stated, **which is considered as a penalty.**

*Id.* at 226, 7 L.Ed. 833 (emphasis added). Accordingly, an interest rate is not rendered usurious by a debtor/cardholder's agreement to pay late fees contingent upon his or her delinquency, because the payment or non-payment of that late fee is completely within the debtor's control. By definition, therefore, an agreement to pay late fees, etc., cannot be deemed equivalent to an agreement to pay a fixed interest rate.

One year prior to the enactment of the NBA, the Supreme Court once again spoke to the differences between interest rates and contingent default charges:

The payment of anything additional depends also upon a contingency, and not upon any happenings of a certain event, which of itself would be deemed insufficient to make a loan usurious.

*Spain v. Hamilton's Administrator*, 68 U.S. (1 Wall.) 604, 626, 17 L.Ed. 619 (1863). Again, these cases stand for the proposition that only where the charge is required for a loan, and not where it is contingent on the happening of an uncertain event, will the charge be considered "interest" at federal common law. Because Congress is presumed to have adopted the federal common law meaning of "interest" in enacting Section 85, *Perrin, supra, Burns, supra*, the statute cannot be interpreted to include contingent default charges within the cardholder's control, such as the fees imposed by Bank One in this case (e.g., late fees, return check fees).

Since the passage of the NBA, federal courts have consistently upheld the interest rate/contingent penalty charge dichotomy. For example, in *Merchants' Nat'l Bank v. Sevier,* 14 F. 662 (C.C.D.Ark.1882), the Arkansas Federal Court held that a provision in a promissory note "to pay an attorney's fee of 10 percent on the amount due if suit is brought to enforce payment (contingent default charge) . . . is a stipulation for a penalty or forfeiture, and tends to the oppression of the debtor . . . is a cover for usury . . . and [is] void." *Id.* at 663–64. The court in *Sevier* stated that "[i]t would be idle to limit interest to a certain rate, if, under another name, forfeitures may be imposed to an amount without limit." *Id.; see also Citizens Nat'l Bank of Orange, Va. v. Waugh,* 78 F.2d 325 (4th Cir.1935); *Chestertown Park of Md. v. Walker,* 163 F. 510 (4th Cir.1908); *Schlesinger v. Arline,* 31 F. 648 (C.C.S.D.Ga.1887); *Hughitt v. Johnson,* 28 F. 865 (C.C.E.D.Mo.1886); *Adams v. Addington,* 16 F. 89 (C.C.N.D.Tex.1883); *Hardin v. Olson,* 14 F. 705 (C.C.D.Minn.1882) (each upholding the distinction between interest rates and contingent penalty fees or charges).

Just last year, the United States Supreme Court in *United States v. Texas,* —— U.S. ——, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) reaffirmed its position that "interest," at common law, does not include processing fees or penalty charges. In *Texas,* the Court examined the Debt Collection Act of 1982, 31 U.S.C.S. §§ 3701 *et seq.,* and found that:

> The common law rule requiring parties owing debts to the Federal Government to pay prejudgment interest where the underlying claim is a contractual obligation to pay money differs from the prejudgment interest liability imposed by [the] Debt Collections Act . . . in that **under the common law** . . . **processing fees and penalty charges are not imposed** [as interest].

*Id.* —— U.S. at —— – ——, 113 S.Ct. at 1635–36 (citations omitted) (emphasis added). *See United States v. Childs,* 266 U.S. 304, 45 S.Ct. 110, 69 L.Ed. 299 (1924) (holding that "the word 'interest' is to be understood in its ordinary sense. . . . To hold that Congress intended to use the word in the sense of a penalty is contrary to all rules of interpretation and

invokes a special definition of the word 'interest' that is unwarranted." (citations omitted)).

The logic behind this continuing federal common law distinction is clear. If charges and fees within a cardholder's control (e.g., contingent penalty charges like late fees) are deemed "interest," the banks or creditors could not possibly know whether the ultimate interest rate on any given account would exceed the interest ceiling provided by law. The cardholder could, therefore, render his or her account usurious and, hence, unlawful by simply being delinquent on his or her payments, thereby incurring "x" amount of late charges. In the absence of clear congressional intent to the contrary, I find that the term "interest rates" or "rates of interest" as used in Section 85 of the NBA ought to be construed in compliance with the term's plain and ordinary meaning and its well entrenched federal common law meaning so as not to include contingent default fees. *Cippollone, supra.*

After sidestepping and ignoring the plain and ordinary meaning of the term "interest rate" or "rate of interest," the First Circuit Court of Appeals in *Greenwood Trust, supra,* the case on which the trial court relied, baldly stated that "federal case law has long suggested that, in ordinary usage, interest may encompass late fees and kindred charges." 971 F.2d at 825. For support, the First Circuit cited the following cases: *American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781 (9th Cir.1982) (compensating balance requirement); *Fisher v. First Nat'l Bank,* 548 F.2d 255 (8th Cir.1977) (fee for cash advance); *Panos v. Smith,* 116 F.2d 445 (6th Cir.1940) (taxes and recording fees); *Cronkleton v. Hall,* 66 F.2d 384 (8th Cir.1933) (bonus or commission paid to lender) (citation omitted). *Id.* at 829.

All of the federal cases cited by the court in *Greenwood Trust,* however, save one federal district court case, involved required, up-front loan charges, not charges contingent upon the debtor's/cardholder's contractual default—e.g., late fees, return check fees. In relying on these cases to expand the scope of Section 85 preemption, therefore, the *Greenwood Trust* court has ignored federal precedent, *Lloyd, supra,*

*Spain, supra, et al.,* and erroneously equated "required fees" with "contingent fees," the latter requiring the happening of an uncertain event. Again, according to federal common law, a required fee may, in certain circumstances, constitute "interest," while a contingent charge may not.

Next, I submit that applying Ohio's definition of "interest rate" or "rate of interest" to Section 85 so as to preempt Pennsylvania's inveterate consumer protection laws is unconstitutional. Absent a congressional declaration of what constitutes "rate of interest," I find that applying one state's definition is contrary to both the public policy of this Commonwealth and the Constitution of the United States. Specifically, the majority's employment of Ohio law to define "rate of interest" in Section 85 amounts to an improper delegation of Congressional power to a state. Neither Ohio law, nor the law of any other state may determine the preemptive scope of a federal statute without input from Congress.

It is axiomatic that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). Interpreting "rate of interest" as used in Section 85 to preempt only those state laws which regulate time-based rates of interest (e.g., APR's) or required fees (e.g., annual fees) for a loan avoids any constitutional question because such an interpretation sets a definite federal limit on Section 85's preemptive scope. Interpreting "rate of interest" to include late fees and other contingent default charges as defined by Ohio law and/or various other states' laws, however, raises fundamental constitutional concerns.

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. Moreover, the Congress shall have power "[t]o make all Laws which shall be necessary and proper for carrying into Execu-

tion the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States . . . ." U.S. Const. art. I, § 8, cl. 18.

Generally, Congress is not permitted to abdicate or transfer this power to a state. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 421, 55 S.Ct. 241, 248–49, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529, 55 S.Ct. 837, 843, 79 L.Ed. 1570 (1935); *see also United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920); *In Re Rahrer*, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1891); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). Sometimes, however, legislation must be adapted to complex conditions involving tedious details with which Congress cannot deal directly. "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply." *Ryan*, 293 U.S. at 421, 55 S.Ct. at 421. For example, the United States Supreme Court has held that Congress may adopt, for application to federal territory located within state boundaries, future criminal legislation of the state in which the territory is located, *Sharpnack, supra*. The Court has also held that Congress may adopt future state legislation with respect to personal injury actions occurring within territory under its jurisdiction, but also within the boundaries of the state. *Murray v. Joe Gerrick & Co.*, 291 U.S. 315, 318, 54 S.Ct. 432, 433, 78 L.Ed. 821 (1934).

The distinction to be drawn is that Congress may delegate power to states to establish rules or laws to be applied within their own borders, but it may not delegate authority to states to establish rules or laws for the entire country. That one state may speak for the nation "[i]s contrary to the structural assumptions and the tacit postulates of the Constitution as a

whole." Lawrence H. Tribe, *American Constitutional Law,* § 5–20 (1988). This intrastate/interstate distinction, insofar as it pertains to congressional delegation to states, is critical:

> Congress cannot simply delegate to the states the power to legislate in areas that are reserved to Congress—e.g., powers under the interstate commerce clause—but Congress may by federal legislation adopt and incorporate by reference state laws that already exist or that may exist in the future. For example, Congress cannot delegate to Illinois the power to legislate federal pollution standards for the whole country. Then Congress would be abdicating interstate commerce control to one state to legislate for the entire nation. However, Congress can enact legislation prescribing that the federal pollution standard in each state shall be the same as the state standard. Then, it is not abdicating its authority but merely incorporating by reference future legislation.

2 R. Rotunda, J. Nowak, J. Young, *Treatise on Constitutional Law—Substance and Procedure,* § 12.6 (1986). *See Brown–Forman Distillers Corp. v. New York Liquor Auth.,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (each case invalidating state laws that purported to regulate commercial conduct on an extraterritorial basis).

In my opinion, allowing Ohio law to define "rate of interest" in Section 85 of the NBA unconstitutionally enlarges the preemptive scope of the statute in that, by doing so, Congress is delegating to Ohio the power to legislate federal banking law for the entire country. The effect of this is to trump the individual states' consumer protection laws.[2]

Moreover, looking to state law to ascertain the preemptive reach of Section 85 produces absurd and unpredictable results. The Ohio legislature or judicial system may, at any time, alter or expand its definition of "rate of interest," thereby having

---

**2.** *See infra* note 1 and accompanying text.

further negative ramifications on this state's and other states' "non-interest rate" or consumer protection laws. Under this scheme, therefore, the legislature and/or courts of Ohio are completely unaccountable to the vast majority of cardholders—e.g., Pennsylvania cardholders—who are subjected to its laws. I cannot approbate such an application.

The trial court relied on the decision in *Greenwood Trust, supra,* which, in turn, cites various United States Supreme Court decisions, to support its proposition that state law, and Ohio law specifically, may be used to define "rate of interest" as that term is used in Section 85. Such reliance is misplaced in that all of the cases to which the *Greenwood Trust* court cites lack the extraterritorial/interstate impact of the instant case and are, therefore, distinguishable on that basis alone. *Brown–Forman, supra; Southern Pacific, supra.*

Because the financial protection of this Commonwealth's citizens is of profound local concern, *Northeast Bancorp, supra, Smith, supra,* I find that Bank One has not met its burden of showing that Congress intended Section 85 of the NBA to nationalize or federalize the Ohio definition of "interest." Additionally, Bank One has not established that Congress' "clear and manifest purpose" of using the term "interest" or "rate of interest" in Section 85 was to preempt state laws prohibiting late fees, annual fees, etc. *Cippollone, supra.* Until Congress speaks to this precise issue, the term "rate of interest" in Section 85 must be interpreted in accordance with federal common law. Finally, and based on the foregoing, I suggest that extending Section 85's preemptive scope to vitiate Pennsylvania's consumer credit laws is unconstitutional.

Accordingly, I concur.

WIEAND, Judge, dissenting:

The issue in this appeal is whether Pennsylvania law may invalidate fees charged to a credit card holder residing in Pennsylvania, where the credit card was issued by a national bank located in Ohio, under whose law such charges are deemed lawful interest. A majority of the Court, after care-

fully considering this issue, concludes that it is the legislature in Pennsylvania and not the law of the state in which a national bank is located which determines the charges to be made to bank customers who reside in Pennsylvania. Unfortunately, the majority's decision is contrary to the decisions of other courts which have considered this issue and will, in my judgment, remove Pennsylvania from the mainstream of national banking practices.

Bank One, Columbus, N.A., is a nationally chartered banking institution based in Columbus, Ohio. It extends open-ended credit card accounts to a nationwide customer base. Jennifer and Daniel Mazaika are residents of Pennsylvania who obtained a credit card from Bank One pursuant to a card-member agreement which provides for a twenty-four (24%) percent finance charge on all outstanding balances. The card-member agreement also permits Bank One to charge credit card holders an annual fee of twenty ($20) dollars, a service fee of eighteen ($18) dollars for any checks returned, a service fee of eighteen ($18) dollars for over-credit-limit charges and a service fee of eighteen ($18) dollars if a minimum monthly payment is not received within twenty-five (25) days after the same is due. Under the law in effect in Ohio, these charges are considered lawful interest.[1]

In a civil action filed by the Mazaikas on behalf of themselves and other Pennsylvania residents similarly situated, it is contended that such charges violate the Pennsylvania Goods and Services Installment Sales Act of October 28, 1966, P.L. 55, 69 P.S. § 1101, et seq., the Pennsylvania Consumer Protection Law of December 17, 1968, P.L. 1224, 73 P.S. § 201–1, et seq., as well as Pennsylvania common law. Bank One filed preliminary objections in the nature of a demurrer to the complaint on grounds that Ohio law was controlling under the

---

1. At Ohio Revised Code Annotated § 1107.262(A) it is provided as follows:

"[A] bank may charge, collect, and receive, as interest, other fees and charges that are agreed upon by the bank and the borrower, including, but not limited to, periodic membership fees, cash advance fees, charges for exceeding a designated credit limit, charges for late payments, and charges for the return of a dishonored check...."

National Bank Act, 12 U.S.C. § 85, by which Congress pre-empted the field. The trial court agreed and entered judgment in favor of Bank One. The Mazaikas appealed.

Article VI of the United States Constitution provides that the laws of the United States "shall be the supreme law of the land." Where Congress has pre-empted a field, state laws are without effect. *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 163, 6 L.Ed. 23, 62 (1824). See also: *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422 (1992). In any pre-emption analysis, it is necessary to consider Congress' intent. *Cipollone v. Liggett Group, Inc.*, *supra* at ——, 112 S.Ct. at 2617, 120 L.Ed.2d at 422; *English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990). Congress' intent may be either expressed or implied; however, absent a clear expression of an intent to pre-empt, state laws remain in force unless they conflict with the federal enactment. *English v. General Elec. Co., supra.*

With respect to the National Bank Act, the question of pre-emption is settled. Through the National Bank Act, Congress established a general system of regulations governing nationally-chartered banks and adopted state laws only as they severally fixed the amount of interest which could be charged. *Evans v. Nat'l Bank of Savannah*, 251 U.S. 108, 111, 40 S.Ct. 58, 59, 64 L.Ed. 171, 175 (1919). When a national bank is involved, the appropriate penalty for charging unlawful interest is provided exclusively by the National Bank Act, 12 U.S.C. § 86. *Haseltine v. Central Nat'l Bank of Springfield*, 183 U.S. 132, 133, 22 S.Ct. 50, 51, 46 L.Ed. 118, 119 (1901). Although a national bank may be subject to the police powers of the states in certain instances, state laws which interfere with the purposes of the National Bank Act are void. *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692, 705 (1944). As the Court observed in *Davis v. Elmira Savings Bank*, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700 (1896),

National Banks are instrumentalities of the federal government, created for a public purpose, and as such necessar-

ily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the federal government to discharge the duties for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court.

*Id.* at 283, 16 S.Ct. at 503, 40 L.Ed. at 701. It is well established, therefore, that the National Bank Act pre-empts any unauthorized attempts by the states to regulate the conduct of national banks.

Congress promulgated the National Bank Act with an intent to make national banks national favorites and to put them on a competitive plane with their state counterparts by preventing the states from passing laws favoring state-chartered banks.

It was expected [national banks] would come into competition with State banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this they were empowered to reserve interest at the same rates, whatever those rates might be, which were allowed to similar State institutions.

*Tiffany v. Nat'l Bank of Missouri,* 85 U.S. (18 Wall) 409, 412, 21 L.Ed. 862, 863 (1873).

Section 85 of the National Bank Act, 12 U.S.C. § 85, specifies the amount of interest that a national bank may charge as follows:

Any association may take, receive, reserve, and charge on any loan ... interest at the rate allowed by the laws of the State ... where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more....

Pursuant to this section, a national bank may "export" a favorable interest rate from its home state and apply it in transactions with out-of-state borrowers. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978).

The defendant in *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., supra,* was a national bank which, although located in Nebraska, had issued credit cards to borrowers in Minnesota. Borrowers in Minnesota who maintained accounts with the defendant-bank were obligated to pay interest on outstanding balances at a percentage rate which, although permitted under Nebraska law, exceeded that which was allowed by the law of Minnesota. The Supreme Court held that the defendant-bank could charge the interest rates allowed by Nebraska, the state in which it was located.

In so doing, the Court examined the legislative purpose of the National Bank Act, which, it said, was to give a national bank an advantage over state competitors. *Id.* at 314, 99 S.Ct. at 548, 58 L.Ed.2d at 545. In order to achieve this goal, the Act authorized a national bank to charge the same interest that was available to the most favored lender in the bank's home state. Section 85 of the National Bank Act, therefore, provided that a national bank could charge interest on any loan to the extent allowed in the state in which the bank was located. *Id.* at 313, 99 S.Ct. at 548, 58 L.Ed.2d at 545. This principle, the court held, was not annulled when borrowers lived in another state whose laws allowed lower interest rates. Under this holding, a national bank can "export" its home state's favorable interest laws to transactions with out-of-state borrowers; and to the extent the laws of the borrowers' states are in opposition, they have been pre-empted. *Id.* at 318, 99 S.Ct. at 550, 58 L.Ed.2d at 548.

The majority concedes that, under *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., supra,* a national bank may charge out-of-state borrowers the rate of interest permitted in its home state. The majority also agrees that, to the extent a borrowers' home state sets a lower interest rate, its laws are pre-empted. It is argued, however, that interest,

as contemplated by the National Bank Act, does not include late fees, annual fees, return check charges or over-credit-limit charges, notwithstanding the definition of interest adopted by the state in which the bank is located. Rather, the majority asserts, these charges are "penalties", to which the National Bank Act has no application and as to which the states remain free to regulate. This, in effect, would limit the "exportation" doctrine to only those charges which are based on annual percentage rates.

In the absence of a statutory definition, it is assumed that the legislative purpose of a federal enactment is expressed by the ordinary meaning of the words used. *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 47, 109 S.Ct. 1597, 1607–1608, 104 L.Ed.2d 29, 46 (1989). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199, 204 (1979). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (1989), quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

In general, the courts have declined to affix to the term "interest" a narrow interpretation which would exclude any flat rate fees. Traditionally, interest has been understood to include any compensation allowed by law or fixed by the parties for the use or forbearance of money, or the price which is fixed for the use of money. See: *Deputy v. DuPont* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416, 424 (1940); *Old Colony Railroad Co. v. Commissioner of Internal Revenue,* 284 U.S. 552, 560–561, 52 S.Ct. 211, 214, 76 L.Ed. 484, 489 (1932); *National Bank of Gloversville v. Johnson,* 104 U.S. (14 Otto) 271, 277, 26 L.Ed. 742, 745 (1881); *Brown v. Hiatts,* 82 U.S. (15 Wall) 177, 185, 21 L.Ed. 128, 131 (1873); Black's Law Dictionary, 6th Ed. (1991). Under its ordinary definition, therefore, the term "interest" has traditionally been consid-

ered in a broader sense than the majority has interpreted it. See: *Harris v. Chase Manhattan Bank,* 30 Cal.App. 4th 130, 35 Cal.Rptr.2d 733 (1994); *Tikkanen v. Citibank (South Dakota) N.A.,* 801 F.Supp. 270, 278 (D.Minn.1992). Thus, in *Fisher v. First Nat'l Bank of Omaha,* 548 F.2d 255, 258 (8th Cir. 1977), a federal appellate court held that credit card cash-advance fees were interest. Similarly, in *Hill v. Chemical Bank,* 799 F.Supp. 948, 953 (D.Minn.1992), a federal district court found that late fees were interest. See also: *Sherman v. Citibank (South Dakota) N.A.,* 272 N.J.Super. 435, 640 A.2d 325 (1994). Other flat rate fees which have been considered interest include bonuses and commissions paid to the lender, *Cronkleton v. Hall,* 66 F.2d 384, 387 (8th Cir.), *cert. denied,* 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590 (1933); recording fees and mortgage taxes, *Panos v. Smith,* 116 F.2d 445, 446 (6th Cir.1940); closing costs, *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 F.2d 855, 861–862 (6th Cir.1972); and compensating balance requirements, *American Timber & Trading Co. v. First Nat'l Bank of Oregon,* 690 F.2d 781, 787 (9th Cir.1982).

Congress may look to the laws of the several states to define the term "interest." *Tikkanen v. Citibank (South Dakota) N.A., supra* at 280. Even though federal laws are frequently intended to have uniform nationwide application, Congress may provide that federal enactments be interpreted by reference to state law. *Mississippi Band of Choctaw Indians v. Holyfield, supra* 490 U.S. at 43, 109 S.Ct. at 1605, 104 L.Ed.2d at 43. In Section 85 of the National Bank Law, Congress expressly and unambiguously stated that a national bank was to be subject to the interest provisions of the laws of the state in which the bank was located. Accord: *Franklin Nat'l Bank of Franklin Square v. New York,* 347 U.S. 373, 378 n. 7, 74 S.Ct. 550, 554 n. 7, 98 L.Ed. 767, 774 n. 7 (1954). This requires that we look to the laws of the state in which a national bank is located to determine the manner in which that state defines and allows interest. Thus, the fact that one state considers late fees or service charges to be penalties does not invalidate another state's decision to include the same fees as interest. See: *Harris v. Chase Manhattan Bank, supra* 30

Cal.App.4th at 140, 35 Cal.Rptr.2d 733; *Tikkanen v. Citibank (South Dakota) N.A., supra* at 278. Because each state may define interest differently, the National Bank Act requires that courts rely on the definitional laws adopted by the state in which the bank is located. See, e.g.: *Fisher v. First Nat'l Bank of Omaha, supra* at 261.

In *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993), the plaintiff-bank was a state-chartered bank, located in Delaware, which regularly issued credit cards to Massachusetts' residents. In addition to monthly finance charges, the bank assessed late fees and delinquency charges against accounts in default. Although such charges were permitted as interest in Delaware, they were illegal under the consumer protection laws of Massachusetts. When the Attorney General for the Commonwealth of Massachusetts advised the bank that it had violated state law, the bank filed a declaratory judgment action in federal district court. The district court ruled in favor of the Commonwealth, but the Court of Appeals for the First Circuit reversed.

Because the plaintiff-bank was a state-chartered insured depository institution, the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831 (DIDA), was applicable. DIDA, the Court said, had been derived from and was analogous to the National Bank Act and, like section 85,

> provide[d] the mechanism whereby a bank [could] continue to use the favorable interest laws of its home state in certain transactions with out-of-state borrowers. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 313–19, 99 S.Ct. 540, 548–51, 58 L.Ed.2d 534 (1978); *Gavey [Properties/762 v. First Fin. Sav. & Loan,* 845 F.2d 519, 521 (5th Cir.1988) ]. To the extent that a law or regulation in the borrower's home state purposes to inhibit the bank's choice of an interest term under section 521, DIDA expressly preempts the state law's operation.

*Id.* at 827 (footnote omitted).

In reaching this result, the court rejected the borrowers' contention that flat rate fees could not be considered interest.

. In the first place, we do not believe that the plain meaning of "interest" necessarily restricts the definition of the word to numerical percentage rates. Reference works typically define interest as "a charge for borrowed money[,] *generally*, a percentage of the amount borrowed." *Webster's Ninth New Collegiate Dictionary* 630 (1989) (emphasis supplied); *see also Black's Law Dictionary* 812 (6th ed. 1990). Such definitions do not limit interest to numerical percentage rates, for they simply note that interest is often, but not always, expressed as a percentage.

*Id.* at 824. Interest, the court said, was broad enough to include non-percentage based charges.

Although the court acknowledged that words contained in federal statutes are generally defined by federal common law, it determined that reference to state law was often appropriate.

Resort to uniquely federal definitions is not, however, automatic. "Congress sometimes intends that a statutory term be given content by the application of state law." *Mississippi Band*, 490 U.S. at 43, 109 S.Ct. at 1605. In such instances, a federal court may properly use state law to fill the interstices within a federal legislative scheme. *See, e.g., Kamen* [*v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 107–09, 111 S.Ct. 1711, 1722–23, 114 L.Ed.2d 152 (1991) ] (holding it proper to borrow a definition from state corporate law); *Mississippi Band*, 490 U.S. at 47–53, 109 S.Ct. at 1607–11 (allowing state-law definition of "domicile" to inform a federal definition); *Federal Election Comm'n v. National Right to Work Comm*, 459 U.S. 197, 204–05, 103 S.Ct. 552, 557–58, 74 L.Ed.2d 364 (1982) (similar in corporate law context); *DeSylva v. Ballentine*, 351 U.S. 570, 580–81, 76 S.Ct. 974, 979–80, 100 L.Ed. 1415 (1956) (borrowing definition from state domestic relations law); *Reconstruction Fin. Corp. v. Beaver County*, 328 U.S. 204, 208–10, 66 S.Ct. 992, 994–96, 90 L.Ed. 1172 (1946) (borrowing definition from state property law). This "does not mean that a State would be entitled to use [a statutory term] in a way entirely strange to those familiar with its ordinary usage, but at

least to the extent there are permissible variations in the ordinary concept [of that term] we [may] deem state law controlling." *DeSylva*, 351 U.S. at 581, 76 S.Ct. at 980. *Id.* at 828–829. Because the Act of Congress specifically stated that interest should be determined by reference to the laws of the state in which the bank was located, the court reasoned, Delaware's liberal definition of interest was applicable. The court added, however, that an analysis under federal common law did not yield a converse result.

Several courts in analyzing the language of section 85 of the Bank Act, have had little trouble in construing the term "interest" to encompass a variety of lender-imposed fees and financial requirements which are independent of a numerical percentage rate. *See, e.g., American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781, 787–88 (9th Cir.1982) (compensating balance requirement); *Fisher v. First Nat'l Bank,* 548 F.2d 255, 258–61 (8th Cir.1977) (fee for cash advance); *Panos v. Smith,* 116 F.2d 445, 446–47 (6th Cir.1940) (taxes and recording fees); *Cronkleton v. Hill,* 66 F.2d 384, 387 (8th Cir.) (bonus or commission paid to lender), *cert. denied,* 290 U.S. 685, 54 S.Ct. 121, 78 L.Ed. 590 (1933); *Nelson v. Citibank (South Dakota) N.A.,* 794 F.Supp. 312, 318 (D.Minn.1992) (late fees). Fairly read, these opinions expand the scope of section 85 preemption— and, by implication, the scope of section 521 preemption— well beyond periodic percentage rates.

*Id.* at 829–830 (footnote omitted).

Other courts which have considered this issue have uniformly reached the same result. See: *Harris v. Chase Manhattan Bank, supra; Smiley v. Citibank (South Dakota) N.A.,* 26 Cal.App.4th 1767, 32 Cal.Rptr.2d 562 (1994), *appeal granted,* 35 Cal.Rptr.2d 269, 883 P.2d 387 (1994); *Tikkanen v. Citibank (South Dakota) N.A., supra; Hill v. Chemical Bank, supra; Nelson v. Citibank (South Dakota) N.A.,* 794 F.Supp. 312 (D.Minn.1992); *Roper v. Consurve, Inc.,* 777 F.Supp. 508 (S.D.Miss.1990), *aff'd,* 932 F.2d 965 (5th Cir.), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 142 (1991); *Sherman v. Citibank (South Dakota) N.A., supra; Ament v. PNC Nat'l*

*Bank,* 849 F.Supp. 1015 (W.D.Pa.1994); *Goehl v. Mellon Bank (DE),* 825 F.Supp. 1239 (E.D.Pa.1993); *Ament v. PNC Nat'l Bank,* 825 F.Supp. 1243 (W.D.Pa.1992); *Watson v. First Union Nat'l Bank of South Carolina,* 837 F.Supp. 146 (D.S.C. 1993).

In my judgment, these decisions represent a logical application of the "exportation" principal announced by the Supreme Court in *Marquette National Bank v. First of Omaha Service Corp., supra,* and a correct interpretation of the plain language of the National Bank Act. The interest which may be charged by a national bank is determined according to the laws of the state in which the national bank is located. Where, as here, the home state of the national bank has defined interest broadly to include service fees and charges which are measured other than by a numerical percentage rate, the bank may rely on those laws in making charges for borrowed money. Thus, if a borrower chooses to borrow money from a national bank located in another state, the national bank should be permitted to rely upon the lending charges permitted in its home state, even if those charges are not permitted in the borrower's state. *Smiley v. Citibank (South Dakota) N.A., supra* 26 Cal.App.4th at 1772, 32 Cal. Rptr.2d at 565.

It is significant that this interpretation is consistent with the opinion given by the Office of the Comptroller of Currency, which is the agency charged with the regulation of national banks. See: *Clark v. Securities Industry Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757, 771 (1987) (in interpreting a statute, consideration may be given to the interpretation adopted by the agency charged with enforcement). According thereto, a national bank may look to the laws of the state in which it is located to determine whether it may include service charges and other fees as lawful interest. See, e.g.: Richard Fitzgerald, Director, OCC Legal Advisory Services Div. 3, Letter of Nov. 24, 1980; William Bowden, Jr., OCC Chief Counsel, Letter of Feb. 4, 1992; Robert Serino, OCC deputy Chief Counsel, Letter of August 11, 1988. This

general consensus is the basis on which modern interstate banking is conducted.

The majority's contrary holding deprives national banks of the favored status which Congress intended, for Pennsylvania will now be able to enact laws allowing local banks and savings institutions to assess late fees and service charges while denying the same rights to national banks. See: *Tiffany v. Nat'l Bank of Missouri, supra* 85 U.S. at 412, 21 L.Ed. at 863. It will also undermine Congress' attempt to create uniformity within the banking industry, for a bank located in one state will become subject to the disparate interest laws enacted in all of the fifty states in which it does business. See: *Marquette Nat'l Bank v. First of Omaha Service Corp., supra* 439 U.S. at 312, 99 S.Ct. at 547, 58 L.Ed.2d at 544 (requiring national bank to adhere to restrictions of each state would "throw into confusion the complete system of modern interstate banking.").

I would hold, therefore, that Pennsylvania laws which attempt to regulate the amount and type of interest charged to Pennsylvania residents by national banks located in other states are ineffective. The matter of interest to be charged by a national bank has been pre-empted by the National Bank Act and is determined according to the laws of the state in which the bank is located.[2] Because the majority holds otherwise, I respectfully dissent.

POPOVICH and SAYLOR, JJ., join.

---

**2.** Whether application of the "exportation" doctrine announced by the Supreme Court in *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., supra,* to this case would result in an unconstitutional delegation of Congressional power to the State of Ohio was not considered by the trial court and is not now properly before this Court. If necessary, this issue can better be decided at a later date, after it has been briefed and argued fully by all interested parties.